**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **CHAPTER 11** |
| **HIDDEN LAKE ACADEMY, INC** | ) | |
| | ) | **CASE NO. 09-22028** |
|     **Debtor.** | ) | |

---

**AMENDED DISCLOSURE STATEMENT FOR**
**SECOND AMENDED PLAN OF REORGANIZATION**
**FOR HIDDEN LAKE ACADEMY, INC.**

**Dated this 19th day of February, 2010**

---

Filed by:

Hidden Lake Academy, Inc.

Attorneys for Debtor and Debtor in Possession,
Barbara Ellis-Monro
Ellenberg, Ogier, Rothschild & Rosenfeld, PC
170 Mitchell Street, SW
Atlanta, GA 30303
(404) 525-4000 Telephone
(404) 526-8855 Facsimile
bem@eorrlaw.com

**Disclaimer**

*All Creditors and Holders of Interests are advised and encouraged to read this Disclosure Statement and the Plan in their entirety.  Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, any exhibits, and the Disclosure Statement as a whole.*

*This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws.  This Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed on the accuracy or adequacy of the statements contained herein.  This Disclosure Statement was prepared to provide holders of Claims and Interests in the Debtor with "adequate information" (as defined in the Bankruptcy Code) so that they can make an informed judgment about the Plan.*

*As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute nor be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.*

*The information contained in this Disclosure Statement is included herein for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to, and how to vote on, the Plan.*

*This Disclosure Statement shall not be admissible in any nonbankruptcy proceeding involving the Debtor and any party, nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtor; provided, however, that in the event the Debtor defaults under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default.*

**THE REPRESENTATIONS IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE DEBTOR.   NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS STATEMENT.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THIS PLAN WHICH IS OTHER THAN AS CONTAINED IN THIS DOCUMENT SHOULD NOT BE RELIED UPON BY ANY PERSON.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  EVERY EFFORT, HOWEVER, HAS BEEN MADE TO PROVIDE ADEQUATE FINANCIAL INFORMATION IN THIS DISCLOSURE STATEMENT.  THE REPRESENTATIONS BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT ANY INACCURACY, ALTHOUGH EVERY EFFORT HAS BEEN MADE TO BE ACCURATE.   NEITHER THE PLAN NOR THIS DISCLOSURE STATEMENT HAS BEEN DESIGNED TO FORECAST CONSEQUENCES WHICH FOLLOW FROM A GENERAL REJECTION OF THIS PLAN, ALTHOUGH AN ATTEMPT IS MADE TO STATE THE CONSEQUENCES OF A LIQUIDATION OF THE DEBTOR.**

## I.    <u>Introduction and General Information</u>

This disclosure statement ("Disclosure Statement") is submitted by Hidden Lake Academy, Inc. (the "Debtor"), to provide information to parties in interest about the Chapter 11 Plan (the "Plan") filed by the Debtor.  This introductory section is qualified in its entirety by the detailed explanations which follow and the provisions of the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition history and events that have occurred during the Debtor's Chapter 11 case.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and voting procedures that holders of Claims in Impaired Classes must follow for their votes to be counted.

*This Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, events in the Debtor's Chapter 11 case, and financial information.  Although the Debtor believes that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions.  Factual information contained in this Disclosure Statement has been provided by the Debtor's management, except where otherwise specifically noted.  The Debtor is unable to warrant or represent that the information contained herein, including the financial information, is without any inaccuracy or omission.  The financial data set forth herein, except as otherwise specifically noted, has not been subjected to an independent audit.*

*Nothing contained herein shall (1) constitute an admission of any fact or liability by any party, (2) be admissible in any nonbankruptcy proceeding involving the Debtor or any other party; provided, however, that in the event the Debtor defaults under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default, or (3) be deemed conclusive advice on the tax or other legal effects of the Debtor's Plan as to holders of Claims or Interests.  You should consult your personal counsel or tax advisor on any questions or concerns regarding tax or other legal consequences of the Plan.*

*Except for historical information, all the statements, expectations, and assumptions, including expectations and assumptions contained in this Disclosure Statement, involve a number of risks and uncertainties.  Although the Debtor has used its best efforts to be accurate in making these statements, it is possible that the assumptions made by the Debtor may not materialize.  In addition, other important factors could affect the prospect of recovery to Creditors including, but not limited to, the inherent risks of litigation and the amount of Allowed Claims.*

Parties voting on the Plan should read both the Plan and this Disclosure Statement.

### A.    Definitions

Unless otherwise defined, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.  In the event of an inconsistency between the Disclosure Statement and the Plan, the terms of the Plan shall govern and such inconsistency shall be resolved in favor of the Plan.

### B.    The Disclosure Statement

The primary purpose of this Disclosure Statement is to provide parties entitled to vote on the Plan with adequate information so that they can make a reasonably informed decision prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guarantee of the accuracy or completeness of the information contained herein, nor an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind the Debtor and all holders of Claims against and Interests in the Debtor, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive or retain any Distributions or property under the Plan.  Thus, you are encouraged to read this Disclosure Statement carefully.  In particular, holders of Impaired Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan, and any exhibits to the Plan and Disclosure Statement, carefully and in their entirety before voting to accept or reject the Plan.  This Disclosure Statement contains important information about the Plan, the method and manner of distributions under the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning this case.

## II.    Voting on the Plan  and Confirmation Process

### A.    Voting Instructions

Accompanying this Disclosure Statement are copies of the following documents:  (1) the Plan; (2) a Notice to Voting Classes; and (3) a Ballot to be executed by Holders of Claims in Classes 2 through 11 (the "Voting Classes"); which classes are entitled to vote to accept or reject the Plan.  The Ballot contains voting instructions.  Please read the instructions carefully to ensure that your vote will count.

The Disclosure Statement, the form of Ballot, and the related materials delivered together herewith (collectively, the "Solicitation Package"), are being furnished to Holders of Claims in the Voting Classes for the purpose of soliciting votes on the Plan.

If you did not receive a Ballot in your Solicitation Package, and believe that you should have received a Ballot, please contact, the law offices of Ellenberg, Ogier, Rothschild &

Rosenfeld, PC, 170 Mitchell Street, SW, Atlanta, GA 30303 (404) 525-4000 (Attn: Barbara Ellis-Monro, Esq.).

IN ORDER FOR YOUR BALLOT TO COUNT IT MUST BE RECEIVED WITHIN THE TIME INDICATED ON THE BALLOT AND THE BALLOT MUST CLEARLY INDICATE YOUR CLAIM, THE CLASS OF YOUR CLAIM, AND THE AMOUNT OF YOUR CLAIM.

BY ENCLOSING A BALLOT, THE DEBTOR IS NOT ADMITTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN, IS NOT ADMITTING THAT YOUR CLAIM IS ALLOWED AS SET FORTH ON THE BALLOT, AND IS NOT WAIVING ANY RIGHTS TO OBJECT TO YOUR VOTE OR YOUR CLAIM.

### B.    Who May Vote

Only a holder of an Allowed Claim classified in an Impaired Class is entitled to vote on the Plan.  As set forth in section 1124 of the Bankruptcy Code, a class is "Impaired" if legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered.

Any class that is "unimpaired" is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan.

A Claim must be "allowed" for purposes of voting in order for such creditor to have the right to vote.  Generally, for voting purposes a Claim is deemed "allowed" absent an objection to the Claim if (1) a proof of claim was timely filed, or (ii) if no proof of claim was filed, the Claim is identified in the Debtor's Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules, in which case the Claim will be deemed allowed for the specified amount.  In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes.  Accordingly, if you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes.

THE DEBTOR IN ALL EVENTS RESERVES THE RIGHT THROUGH THE CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN.

### C.    Requirements of Confirmation

The Bankruptcy Court can confirm the Plan only if all the requirements of § 1129 of the Bankruptcy Code are met.  Those requirements include the following:

1.    The Plan classifies Claims and Interests in a permissible manner;

2.    The contents of the Plan comply with the technical requirements of the Bankruptcy Code;

3.    The Plan has been proposed in good faith and not by any means forbidden by law;

4.    The disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan, as well as the identity, affiliations, and compensation to be paid to all officers, directors, and other insiders; and

5.    The principal purpose of the Plan is not the avoidance of tax or the avoidance of the securities laws of the United States.

In addition to the confirmation requirements described above, the Plan must also be approved by all Impaired Classes of Claims entitled to vote.  If, however, the Plan has not been approved by all Impaired Classes of Claims, the Court may nevertheless "cram down" the Plan over the objections of a dissenting Class.  The Plan may be "crammed down" so long as it does not discriminate unfairly, is fair and equitable with respect to each dissenting Class of Claims, and at least one Impaired Class has voted in favor of the Plan without regard to any votes of insiders.  Debtor will seek to "cram down" the Plan if it is accepted by an Impaired Class over the objections of a dissenting class.

### D.    Acceptance or Rejection of the Plan and Cram Down

The Class containing your Claim will have accepted the Plan by the favorable vote of majority in number and two-thirds in amount of Allowed Claims actually voting.   In the event that any Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan if an Impaired Class accepts it and if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." If you hold an Allowed Secured Claim, the Plan is fair and equitable if you retain your lien and receive deferred cash payments totaling the allowed amount of your Claim as of the Effective Date of the Plan, the collateral is sold and your Lien attaches to the proceeds of the sale, or you are otherwise provided with the "indubitable equivalent" of your Allowed Secured Claim.  If you hold a Claim that is not an Allowed Secured Claim, and is not entitled to priority under § 507 of the Bankruptcy Code, the Plan is fair and equitable if you receive property of a value equal to the allowed amount of your Claim or if no junior Class receives or retains anything under the Plan.

### E.    Confirmation Hearing

The Bankruptcy Court will enter an order (the "Scheduling Order") that schedules a hearing to consider confirmation of the Plan ("Confirmation Hearing") at the time indicated in the Order Approving Disclosure Statement and Notice of Confirmation Hearing.   The Confirmation Hearing may be adjourned from time to time without further notice except for announcement at the Confirmation Hearing or notice to those parties present at the Confirmation Hearing.

**F.**     **Objections to Confirmation**

As will be set forth in the Scheduling Order, any objections to confirmation of the Plan must be in writing, set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for the Debtor. The Scheduling Order contains all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

**G.**     **Whom to Contact for More Information**

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact Barbara Ellis-Monro at the address indicated below or by telephone at (404) 525-4000. If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the law offices of Ellenberg, Ogier, Rothschild & Rosenfeld, PC, 170 Mitchell Street, Atlanta, GA 30303, Attn: Barbara Ellis-Monro; or by facsimile at (404) 526-8869, or by electronic mail, at bem@eorrlaw.com.

**III.**    **Historical Background**

**A.**     **Description of the Debtor**

Debtor, a Georgia corporation, organized and began operations in 1994. Debtor owns approximately 196.3 acres of real estate located at 830 Hidden Lake Road, Dalhonega, Georgia ("Real Property"). Debtor has historically derived its income from provision of management services and the lease of real property and improvements to two (2) affiliated entities, Ridge Creek, Inc. ("RCI") and HLA, Inc. ("HLA"). HLA operated a therapeutic boarding school on the Real Property under the name Hidden Lake while RCI offered programs under the Creekside and Ridge Creek names. HLA filed a voluntary petition under Chapter 11 of Title 11 of the United States Code pending in this Court under case no. 09-22026. RCI is not a debtor under Title 11 of the United States Code.

The Debtor employed 12 individuals as of the filing of its case. Historically HLA paid the Debtor a management fee equal to the salaries of the Debtor's employees and certain other expenses necessary to HLA's operation. Pursuant to a prior management agreement and lease, HLA was obligated to make payments sufficient to fund the Debtor's obligation to its secured lender. HLA was not current on these payments prior to or during the case. Since the Filing Date, and in an effort to reduce its costs, overlapping job responsibilities and as required by current enrollment, as of the date hereof the Debtor no longer has any employees.

Dr. Leonard Buccalleto is the sole shareholder and Chief Executive Officer of the Debtor and of RCI. Dr Buccalleto founded the schools operated by HLA and RCI in 1994 and 2000 respectively.

From 1994 through September, 2006, the enrollment at HLA averaged 135 students and provided sufficient operating income for the Debtor to pay its employees and service its mortgage debt.  In September, 2006, a group of former students and their parents filed that certain law suit captioned *Ryan et.al. v. Hidden Lake Academy, HLA, Inc., Hidden Lake Academy Foundation, Leonard Buccellato* (the "Litigation"),  alleging breach of contract claims and seeking class action status.

The filing of the Litigation had a severely negative impact on the Debtor's enrollment and while the Litigation was pending, the enrollment at HLA dropped to 40.   The drop in enrollment caused HLA's cash flow to decrease such that it was not able to pay its lease obligations to the Debtor and thus, the Debtor was not able to make payments on its mortgage.

The Litigation was settled in October, 2008 and in February, 2009 the District Court entered a consent judgment in the Litigation. Notwithstanding the settlement, enrollment continued to be adversely affected, due in large part to negative postings on the internet such that HLA was not able to pay its obligations to Branch Banking and Trust Company ("BB&T)  and BB&T began advertising for foreclosure of its interest in the Real Estate which secures the Debtor's guaranty of HLA's obligations to BB&T.

### B.    Prepetition Assets and Liabilities

The Debtor's assets as of the date of the Filing Date consisted of the Real Property with a value of approximately $10,000,000.00. This is the Debtor's opinion as to value of the Real Property and is based upon an appraisal completed in September, 2006 which valued the property at $15,600,000.00. Taking into consideration the overall decline in real estate values since the fall of 2006 and the limited special uses for which the Real Property could be used it is the Debtor's opinion that the current fair market value of the Real Property is $10,000,000.00.

As of the Filing Date, Debtor's estimated liabilities totaled $7,637,928.76 and included the following: (a) secured claims totaling $6,959,474.10; (b) priority tax claims totaling $246,487.54, and (c) unsecured claims totaling $431,967.12.  Since the Petition Date, certain non-debtor defendants in the Litigation have paid the judgment in full and thereby reduced the Debtor's general unsecured obligations by $400,000.00 to $31,967.12.  Proofs of claim for priority taxes filed by the Internal Revenue Service, the Georgia Department of Revenue and Lumpkin County  total $561,690.75.   Proofs of claim asserting unsecured indebtedness filed prior the bar date total $220,302.58.

## IV.   The Chapter 11 Case

### A.    Reasons for Filing Chapter 11

Debtor filed bankruptcy to stop a pending foreclosure. BB&T, the mortgage holder, scheduled a foreclosure on the Real Property for June 3, 2009.   In addition, the judgment creditors filed garnishments against all of the Debtor's and HLA's bank accounts.  Just before the filing of this case, the judgment creditors garnished in excess of $70,000 from the Debtor and HLA's bank accounts.

**B.**      **Professionals**

On May 14, 2009, Debtor filed an application ("Application") requesting authorization to retain the law firm of Ellenberg, Ogier, Rothschild & Rosenfeld, PC ("EORR") to serve as bankruptcy counsel in this case.  On June 26, 2009, the Court entered an Order approving employment of EORR as counsel for the Debtor as of the Petition Date.

**C.**      **Schedules**

On June 8, 2009, Debtor filed its schedules and statement of financial affairs.  A copy of the schedules and statement of financial affairs can be reviewed at the Office of the Bankruptcy Clerk, 1340 Richard B. Russell Federal Building, 75 Spring Street, Atlanta, Georgia, during normal business hours or online at http://ecf.ganb.uscourts.gov (registered users) or at http://pacer.psc.uscourts.gov (unregistered users).

**D.**      **Payments to Creditors Within the Ninety (90) Days Prior to the Filing Date**

Payments to creditors during the ninety (90) days prior to the Filing Date are set forth in the schedules and statement of financial affairs.

Under the Bankruptcy Code, Debtor may seek to avoid and recover certain transfers that occur within the ninety (90) days prior to the Filing Date as preferential under Sections 547 and 550 of the Bankruptcy Code.  The transfers which may be subject to avoidance and recovery must aggregate in value over $5,475.00.  The only transfers during this time period were payments to Lumpkin County on account of property taxes on the Real Property and regular payroll to the Debtor's employees.

**E.**      **Payments to Insiders Within One (1) Year Prior to the Filing Date**

There only payments to insiders within (1) year period prior to the filing date were salary payments totaling $36,600.00 to Dr. Buccellato.

**G.**      **Bar Motion**

On August 7, 2009, Debtor filed a motion ("Bar Motion") requesting that the Court enter an order establishing September 18, 2009 as a deadline for creditors to file proofs of claim.  The Court entered an order establishing September 18, 2009 as the deadline for filing claims in this case.

**H.**      **Cash Collateral Motion**

On May 21, 2009, Debtor filed a Motion Requesting Entry of Interim Order Authorizing Use of Cash Collateral and Scheduling Final Hearing on Debtor's Request to Use Cash Collateral to allow it to continue to use the income received from HLA for the lease of the Real

Property.  On October 16, 2009, the Court entered an Order Granting Motion For Authority to Use Cash Collateral which provides for the Debtor's continued use of rental income and grants BB&T a lien in post-petition rental income to the same priority, extent and valid as BB&T's lien in prepetition rental income.

## V.     Summary of the Plan

**The following summary of the Plan provides only a brief description of its provisions.  The summary is qualified in its entirety by the more detailed descriptions of the Plan in the Disclosure Statement and by the terms of the Plan itself.**

The Plan provides for an equitable distribution to Debtor's creditors and preserves the Debtor's ongoing business operations.  The Debtor believes that any alternative to confirmation of the Plan, such as liquidation or attempts by other parties in interest to file a competing plan, would result in significant delays and/or impaired recoveries.  Moreover, the Debtor believes that the creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. FOR THESE REASONS, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

The Plan contemplates the reorganization of the Debtor and the resolution of the outstanding Claims against and Interests in the Debtor pursuant to sections 1129(b) and 1123 of the Bankruptcy Code.  The Plan classifies all Claims against and Interests in the Debtor into separate Classes.

## VI.    Description of the Plan

### A.    Retention of Property by the Debtor

Upon confirmation, the Reorganized Debtor will retain all of the property of the estate free and clear of liens, claims, and encumbrances not expressly retained by Creditors.  The Reorganized Debtor will have the rights and powers to assert any and all Causes of Action (defined as all causes of action, choses in action, claims, rights, suits, accounts or remedies belonging to or enforceable by the Debtor, including Avoidance Actions, whether or not matured or unmatured, liquidated or unliquidated, contingent or noncontingent, known or unknown, or whether in law or in equity, and whether or not specifically identified in the Debtor's Schedules).

### B.    Continuation of Business Operations

Following confirmation, the Reorganized Debtor will continue to operate its business.

### C.    Parties Responsible for Implementation of the Plan

Upon confirmation, the Reorganized Debtor will be charged with administration of the Case.  The Reorganized Debtor will be authorized and empowered take such actions as are

required to effectuate the Plan, including the prosecution and enforcement of Causes of Action. The Reorganized Debtor will file all post-confirmation reports required by the United States Trustee's office. The Reorganized Debtor will also file the necessary final reports and will apply for a final decree as soon as possible after substantial consummation, the completion of the claims analysis and objection process, and following entry of Final Orders in all Bankruptcy Court litigation.

Dr. Buccellato will continue as the Chief Executive Officer of the Debtor and will not receive any compensation. As of the date hereof, the Debtor no longer has any employees.. Dr. Buccellato, as the officer of the Debtor, acts as an unpaid administrator to collect the Debtor's accounts receivables made up of the monthly management fee and rent due under the RCI Management Agreement and the RCI Lease. Dr Buccalletto will continue to provide these services after confirmation to implement the plan and have payments made in accordance with the Plan.

### D.    Liabilities of the Reorganized Debtor

The Reorganized Debtor will not have any liabilities except those expressly assumed under the Plan. The Reorganized Debtor will be responsible for all Operational Expenses (defined as the normal and ordinary costs and expenses of operating the Debtor's business, including, without limitation, payroll and related taxes, insurance premiums, bank charges, maintenance costs, and all other costs of operations of any type arising after the Petition Date in connection with the operation of the Debtor's business, unless specifically excluded under the Plan) incurred by the Debtor in the ordinary course of business after the Filing Date, and those Operational Expenses will be paid in the ordinary course of business as they become due or as agreed upon by holders of the Operational Expense claim.

### E.    Funding of the Plan

After the filing of its bankruptcy case, HLA could not fund its operations or that of Hidden Lake. Thus, subject to the dismissal of HLA's chapter 11 case or entry of an order approving the same entered in this case each of the Management Agreement and the Lease Agreement between HLA and the Debtor will be terminated. RCI and the Debtor have entered into a Management Agreement (the "RCI Management Agreement") and a Lease (the "RCI Lease"), Pursuant to the RCI Management Agreement RCI shall pay the Debtor $8,233.00 per month for use of the computer equipment leased by the Debtor and used in RCI's operations. The RCI Lease provides for monthly payments in the amount of $66,551.00  which funds will be used to pay the Debtor's obligation to BB&T and all non-lease obligations under the Plan. Thus, the Debtor shall pay all claims from the Debtor's postpetition operational income which will be provided in accordance with the RCI Management Agreement and the RCI Lease.  The Debtor's receipt of income for postpetition operations shall constitute the source for payment of creditors by the Debtor under the Plan.

The Plan provides that the Debtor shall act as the Disbursing Agent to make payments under the Plan unless the Debtor appoints some other entity to do so.  The Debtor may maintain

bank accounts under the confirmed Plan in the ordinary course of business.  The Debtor may also pay ordinary and necessary expenses of administration of the Plan in due course.

Copies of Debtor's profit and loss statement, federal tax returns and the Debtor's projections for 2010 are attached hereto as Exhibits "A", "B", "and C".  Projections for RCI for 2010 are attached as Exhibit "D" and projections for 2011 through 2015 are attached hereto as Exhibit "E".  RCI historically has provided fewer and shorter school programs than those offered by HLA.  RCI began offering additional and extended programs in the later part of 2009. Thus RCI's historical financial information does not  provide information to assess the projections for RCI going forward and RCI's historical financial information is not included in the Debtor's Disclosure Statement.

### F.      Provisions Regarding Executory Contracts

The Debtor provides certain leased computer equipment that is used by RCI.  The Debtor also carries insurance for the Real Property and pays the ad valorem taxes on the Real Property. These amounts are reimbursed to Hidden Lake from RCI pursuant to the RCI Management Agreement which is dated January 15, 2010.  The RCI Management Agreement provides for a yearly fee of $98,796.00. In addition, the Debtor leases the Real Property to RCI pursuant to that certain Commercial Lease dated January 15, 2010 (the "RCI Lease").  The RCI Lease provides for base rent of $66,551.00 beginning in April, 2010 and continuing thereafter for five (5) years plus percentage rent of: (i) 3% of the gross revenues between $414,000 and $600,000 for the preceding month and (ii) 1% of the gross revenues over from $600,000 for the proceeding month. Copies of the RCI Lease and RCI Management Agreement are attached hereto as Exhibits "F" and "G". The Termination Agreements with HLA are attached as Exhibit "H". Debtor is also a party to certain leases with Graybar Financial Services LLC for computer equipment and software.  Debtor will file a notice of intention to assume or reject these equipment leases within 10 (ten) days of the confirmation hearing date.

Nothing herein constitutes nor should it be construed as an admission or waiver of Debtor's rights to seek to challenge the agreements and request a legal determination that such agreements constitute financing agreements. Debtor asserts that all obligations due and owing under the executory contracts and unexpired leases to be assumed hereunder are current.  Any party that asserts a cure claim shall file a request for determination of cure claim on or before sixty (60) days after mailing of notice of the Confirmation Order.  Any requests for determination of cure claim not filed on or before sixty (60) days after mailing of notice of the Confirmation Order will be waived and forever barred and the amounts determined to be due and owing by the Debtor shall become binding upon the parties and their successors, assigns, or heirs.  Any allowed cure amounts will be paid in six (6) equal monthly installments beginning the first month after the Effective Date of the Plan.

Any unexpired leases or executory contracts which are not assumed or are the subject of a pending motion to assume shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code on the Effective Date.  A proof of claim for damages arising from such rejection must be filed in compliance with the Bankruptcy Rules on or before sixty (60) days after mailing of

notice of the Confirmation Order.  Any claims which are not timely filed will be disallowed and discharged.

### G.    Avoidance Actions and Retained Rights

The Plan provides that the Debtor shall retain all rights of action against others.  The Plan also provides that the Debtor shall retain "Avoidance Actions" under chapter 5 of the Bankruptcy Code.

The Debtor may also have Claims against others which are retained.  Notwithstanding the foregoing, the Debtor is reviewing records and believes there are potential preference claims. Further, the Debtor is not aware of any fraudulent conveyance claims.

### H.    Treatment of Claims and Interests

A brief summary of the Classes, the treatment of each Class, and the voting rights of each Class is set forth below.  A complete description of the treatment of each Class is set forth in Article 4 of the Plan.  Monthly payments as set forth below are shown on Exhibits D, E and F hereto.

A chart summarizing each Class and the proposed distribution for each Class is set forth below. A detailed discussion of each Class follows this chart.

| Class # | Description | Insider | Impairment | Treatment |
|---|---|---|---|---|
| 2 | Secured Claim of  BB&T | No | Yes | Interest shall be reduced to 5.25% per annum and the Note will be amortized over 20 years with payment in full 60 months after the Effective Date. |
| 3 | Secured Tax Claims | No | Yes | Interest shall be paid at a fixed rate of 5% per annum on any secured tax claims and will be amortized over 5 years. |
| 4 | Secured Claim of Morris Law Firm | No | Yes | Interest shall be paid at a fixed rate of 5% per annum and will be paid in equal monthly installments over 240 months. |
| 5 | Secured Claim of Dell Financial Services | No | Yes | Secured portion of claim paid in full at a rate $1,200 per month |

| 6 | Secured Claim of GMAC secured by Uplander (I) | No | Yes | Secured portion of claim paid in full over 3 years. |
|---|---|---|---|---|
| 7 | Secured Claim of GMAC Secured by Uplander (II) | No | Yes | Secured portion of claim paid in full over 5 years. |
| 8 | Secured Claim of GMAC Secured by Cobalt | No | Yes | Secured portion of claim paid in full over 5 years. |
| 9 | Secured Claim of GMAC Secured by Malibu | No | Yes | Monthly payments of $223.06 per month until secured claim paid in full. |
| 10 | Unsecured Claims | Yes | Yes | Paid in full with interest at the prime rate from income produced over 5 years in equal monthly installments beginning the month following the Effective Date. |
| 11 | Unsecured Penalty Claims | No | Yes | No distributions under the Plan. |
| 12 | Insider Claims | Yes | Yes | No distributions under the Plan. |
| 13 | Interest | Yes | No | All equity retained by current shareholder. |

6.1     Tax Claims.

6.1.1 Class 1: Priority Tax Claims. Class 1 consists of Priority Tax Claims. Each Holder of an Allowed Tax Claim due and payable on or prior to the Effective Date will receive deferred equal monthly Cash payments over a five (5) year period from the Petition Date plus simple interest on any outstanding balance from the Effective Date calculated at a fixed rate of 5% per annum from the Effective Date or such lesser rate agreed to by a particular taxing authority or paid upon the sale of property to which the lien attaches. The amount of any Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the right of the Holder of such Claim, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code.

A failure by the Reorganized Debtor to make a payment to each Holder of an Allowed Tax Claim pursuant to the terms of the Plan shall be an event of default. If the Reorganized

14

Debtor fails to cure an event of default as to tax payments within ten (10) days notice of default by the Holder of an Allowed Tax Claim to the Debtor and Debtor's counsel, then the Holder of an Allowed Tax Claim may (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies it may have under applicable state law; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

Debtor's scheduled $246,487.57 in priority tax debt owed to the United States Department of Labor, Internal Revenue Service, the Georgia Department of Revenue and Lumpkin County.  The Internal Revenue Service filed a proof of claim in the amount of $375,115.57, made up of $302,762.47 in tax and interest and $72,353.10 in penalty.  The Georgia Department of Revenue filed a proof of claim in the amount of $110,731.81 of which $39,410.24 was filed as secured and $61,274.75 was claimed as priority.  The Georgia Department of Revenue included $21,809.41 in penalties in its proof of claim which is  classified as a class 11  claim.  The Department of Revenue filed its lien within 90 days of the Filing Date and the lien is avoidable.  The non-penalty portion of the Georiga Department of Revenue's claim filed as priority and the non-penalty portion claimed as secured will be paid as a Class 1 claim. Lumpkin County filed a proof of claim in the amount of $75,843.37 which will be paid as a Class 1 claim to the extent of $59,759.30 and as a Class 3 claim to the extent of $16,084.07.

6.2    Class 2.  Class 2 consists of the Secured Claim of BB&T. BB&T's claim   is secured by the Real Property as evidenced by the Deed to Secure debt filed with the Superior Court Clerk of Lumpkin County deed book number 1005, Page 652. Pre-Petition Lender filed a proof of claim in the amount of $6,964,487.23.. Debtor estimates the value of the Real Property is Ten Million Dollars ($10,000,000.00). BB&T's claim is fully secured.  BB&T shall receive principal and interest payments for 59 months following the Effective Date and thereafter in the 60th month after the Effective Date shall be paid in full.  Simple interest shall accrue at the rate of five and one-quarter percent (5.25 %) per annum.  Debtor estimates the monthly plan payments for 59 months to BB&T will total approximately $46,930.00 with a balloon payment of approximately $5,800,000.00 due in the 60th month of the plan.

A failure by the Reorganized Debtor to make a payment to the Pre-Petition Lender pursuant to the terms of the Plan shall be an event of default and Pre-Petition Lender will be free to foreclose its interest in the Real Property and exercise any other state law remedies without the need to seek relief from the automatic stay or further authority from the court.

The Holder of the Class 2 Claim is impaired and entitled to vote to accept or reject the Plan.

6.3    Class 3.  Class 3 consists of Secured Tax Claims. As of the Filing Date, Debtor estimates that the amount due and owing to Lumpkin County  totaled approximately $16,084.07. The secured tax claims are secured by the Real Property as provided in O.C.G.A. 44-14-320 Debtor estimates the value of the Real Property is Ten Million Dollars ($10,000,000.00).  The secured tax claim is fully secured and the secured tax claim shall be paid in full plus simple interest at a rate of five percent (5%) per annum over 38 months after the Effective Date or paid upon the sale of property to which the lien attaches. The Georgia Department of Revenue filed a

secured claim in the amount of $39,410.24 comprised of $20,519.91 in sales and use tax and withholding tax and $11,105.59 in penalties. The Department of Revenue filed its fi fa within 90 days of the filing of this case and the lien is avoidable. The secured tax claim asserted by the Department of Revenue is treated as a Class 1.

The Holder of the Class 3 Claim is impaired and is entitled to vote to accept or reject the Plan. Monthly plan payments will total approximately $450.00.

6.4    Class 4.  Class 4 consists of the Secured Claim of the Morris Law Firm. The Morris Law Firm claim is secured by the 5.1 acres of real property located at 830 Hidden Lake Road, Dahlonega, Georgia and all personal property and fixtures located thereon as evidenced by the Deed to Secure debt filed with the Superior Court Clerk of Lumpkin County deed book number 1069 Page 744 and book number 1121 page 224 and a UCC financing statement filed in Bk 1118 page 222-225.. The Morris Law Firm filed two (2) proofs of claim totaling $400,000.00.  Debtor estimates the value of the Real Property is Ten Million Dollars ($10,000,000.00). The Morris Law Firm claim is fully secured. The Morris Law Firm shall receive equal payments of principal and interest for 240 months after the Effective Date and shall be paid in full. Simple interest shall accrue at the rate of five percent (5%) per annum.

The Holder of the Class 4 Claim is impaired and is entitled to vote to accept or reject the Plan. Monthly plan payments will total approximately $2,639.82.

6.5    Class 5.  Class 5 consists of the Secured Claim of Dell Financial Services. The contract with Dell is for the purchase of computer servers and equipment. Dell is partially secured and shall receive payments of principal and interest in the amount of $1,250.00 per month until the secured portion of its claim is paid in full. The remainder of Dell's claim shall be paid as an unsecured claim.

The Holder of the Class 5 Claim is impaired and is entitled to vote to accept or reject the Plan.

6.6    Class 6.  Class 6 consists of the Secured Claim of GMAC Uplander (I). GMAC's Claim is secured by a GMAC Uplander, VIN 1GNDV33L26D135077. The contract with GMAC for the purchase of the Uplander (I) provided for the purchase of the vehicle over 48 months with interest at the rate of 4.9% per annum. The monthly contract payment is in the amount of $836.74. GMAC is secured to the extent of $12,250 and shall receive payments of principal and interest, at the contract rate, in the amount of $366.59 for 36 months until the secured portion of its claim is paid in full. The remainder of GMAC's claim shall be paid as a Class 10 claim.

The Holder of the Class 6 Claim is impaired and is entitled to vote to accept or reject the Plan.

6.7    Class 7.  Class 7 consists of the Secured Claim of GMAC Uplander (II). GMAC's Claim is secured by a GMAC Uplander, VIN 1GNDV33L66D188732. The contract with GMAC for the purchase of the Uplander (II) provided for the purchase of the vehicle over 48 months

with interest at the rate of 4.9% per annum. The monthly contract payment is in the amount of $761.14. GMAC is secured to the extent of $10,650 and shall receive payments of principal and interest, at the contract rate, in the amount of $200.49 for 60 months until the secured portion of its claim is paid in full. The remainder of GMAC's claim shall be paid as a Class 10 claim.

The Holder of the Class 7 Claim is impaired and is entitled to vote to accept or reject the Plan.

6.8    Class 8.  Class 8 consists of the Secured Claim of GMAC Cobalt. GMAC's Claim is secured by a GMAC Cobalt, VIN 1G1AK58F587198803. The contract with GMAC for the purchase of the Cobalt provided for the purchase of the vehicle over 48 months with interest at the rate of 0.0% per annum.  The monthly contract payment is in the amount of $332.63. GMAC is secured to the extent of $10,050 and shall receive payments of principal and interest, at the rate of 4.5%, in the amount of $195.75 for 60 months until the secured portion of its claim is paid in full. The remainder of GMAC's claim shall be paid as a Class 10 claim.

The Holder of the Class 8 Claim is impaired and is entitled to vote to accept or reject the Plan.

6.9    Class 9.  Class 9 consists of the Secured Claim of GMAC Malibu. GMAC's Claim is secured by a GMAC Malibu, VIN 1G1ZS51F06F296217. The contract with GMAC for the purchase of the Malibu provided for the purchase of the vehicle over 36 months with interest at the rate of 3.9% per annum.  The monthly contract payment is in the amount of $503.00. GMAC is fully secured and shall receive equal monthly payments of principal and interest, at the contract rate, in the amount of $223.11 after the Effective Date until the obligations under the Malibu contract are paid in full.

The Holder of the Class 9 Claim is impaired and is entitled to vote to accept or reject the Plan.

6.10.    Class 10. Class 10 consists of the Unsecured Claims. Holders of Allowed Class 10 Claims shall receive a prorata share of 60 equal monthly payments to pay the Allowed Claim Class 10 claims in full plus interest at the prime rate in effect as of the Effective Date.

The Holders of Class 10 Claims are impaired and are entitled to vote to accept or reject the Plan.

6.11    Class 11 consists of the Unsecured Penalty Claims Asserted by the Internal Revenue Service and the Georgia Department of Revenue (collectively the "Taxing Authorities").  The Taxing Authorities shall not receive any distribution for any portion of each claim for penalties.

The Holder of the Class 11 Claim is impaired and deemed to reject the Plan.

6.12    Class 11.  Class 12 consists of Insider Claims.  Insiders shall not receive any distributions under the Plan.

Holders of Class 12 Claims are impaired and deemed to reject the Plan.

6.13    Class 13. Class 13 consists of the Interest Claim. The current interest holders shall retain their interests in the Reorganized Debtor.

The holders of Class 13 Claims are unimpaired and are not entitled to vote to accept or reject the Plan.

## VII.    Administrative Expenses

Treatment of administrative expense claims is set forth in Article 5 of the Plan and summarized below.

7.1    Summary.    Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims against the Debtor are not classified for purposes of voting on, or receiving Distributions under this Plan. Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article V and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

7.2    Administrative Expense Claims.

7.2.1    Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the latest of (i) the Effective Date, (ii) as soon as practicable after the date on which such Claim becomes an Allowed Administrative Expense Claim, (iii) upon such other terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, or (iv) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims representing obligations incurred by the Debtor in the ordinary course of business, or otherwise assumed by the Debtor on the Effective Date pursuant to this Plan, including any tax obligations arising after the Filing Date, will be paid or performed by the Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.

7.2.2    Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim, other than an Administrative Expense Claim arising from the operation by the Debtor of its business in the ordinary course of business, shall file a proof of such Administrative Expense Claim with the Bankruptcy Court within thirty (30) days after the Reorganized Debtor provides notice by mail or by publication, in a form and manner approved by the Court, of the occurrence of the Effective Date.  At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the Administrative Expense Claim upon counsel for the Reorganized Debtor.  Any Person who fails to timely file and serve a proof of such Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claims by the Debtor, the Estate, or the Reorganized Debtor.

7.2.3   Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Effective Date within sixty (60) days after the Effective Date or by such other deadline as may be fixed by the Bankruptcy Court.

The Debtor's attorneys' fees incurred during the remaining pendency of the case shall be paid as the same may be approved by the Bankruptcy Court.   The Plan provides that the Debtor may pay professional fees incurred after confirmation of the Plan without Court approval.  The Debtor shall pay all pre-confirmation fees of professionals as payment of the same is approved by the Court.

The following chart illustrates Debtor's estimated administrative expenses and proposed treatment under the Plan:

| Type | Estimated Amount Owed | Treatment |
| --- | --- | --- |
| Ordinary Course of Business Expenses | None anticipated | Paid in accordance with credit terms of each vendor.<br><br>Will be paid in full the later of (i) the Effective Date; (ii) as soon as practicable after such claim becomes an Allowed Administrative Expense Claim; (iii) upon such other terms as may be agreed upon by the parties; or (iv) pursuant to Court order. |
| Professional Fees | Fees in excess of retainer are estimated not to exceed $25,000. | Paid pursuant to Court order. |
| Other Administrative Expenses | Estimated at no more than $25,000 in cure costs for leases of computer equipment | Paid in accordance with credit terms of each vendor.<br><br>Will be paid in full the later of (i) the Effective Date; (ii) as soon as practicable after such claim becomes an Allowed Administrative Expense Claim; (iii) upon such other terms as may be agreed upon by the parties; or (iv) pursuant to Court order |
| U.S. Trustee Fees | None outstanding | Paid in full on the Effective Date of the Plan |

## VIII.    Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class.  Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes.  Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only.  No specific tax consequences to any Creditor or Holders of an Interest are represented, implied, or warranted.  Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation.

THE PROPONENT ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO THEIR INDIVIDUAL SITUATION.

The receipt by a Creditor or Interest of cash or property in full or partial payment of its Claim or Interest may be a taxable event.  To the extent that a portion of the cash or the fair market value of any property received is attributable to accrued and unpaid interest on a Claim being paid, a Creditor may recognize interest income.  A Creditor or Interest Holder may also recognize gain or loss equal to the difference between the sum of the amount of cash received and the adjusted basis in the Claim or Interest for which the holder receives amounts under the Plan.  Such gain or loss may be treated as ordinary or capital depending upon whether the Claim or Interest is a capital asset.

Under the backup withholding rules of the Tax Code, a  Holder of a Claim may be subject to backup withholding at the rate of thirty-one percent (31%) with respect to Distributions made pursuant to the Plan unless such Holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that it is not subject to backup withholding due to a failure to report all dividends and interest.  Any amount so withheld will be credited against the Holder's federal income tax liability.

## IX.    Debtor's Operations After the Filing Date

Debtor has continued to operate its business as Debtor in possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code since the Petition Date.

## X.    <u>Liquidation Analysis</u>

The Debtor's Plan provides funding for the Plan from ongoing business operations and to pay Holders of Allowed Unsecured Claims in full with interest.

The Debtor believes that in the event the Debtor's estate is liquidated, the unsecured creditors and Holders of Interests would receive an amount less than that proposed in the Plan because of the costs of marketing the Real Property for sale, the special use limitations of the property which would cause marketing to take a longer than average time and the increase in the debt to the secured lender during that time all of which would eliminate the Debtor's equity in the Property and eliminate any return to unsecured creditors.  Conversion and liquidation under Chapter 7 of the Bankruptcy Code would result in the liquidation of non-exempt assets. Assets disposed of by "liquidation" or "fire" sale generally generate fewer  proceeds than assets that are marketed and sold as a going concern. In addition to the increase in debt and costs of sale an additional layer of administrative expense would be added to the case thereby decreasing the amounts available to pay unsecured creditors.

As explained above, the Debtor estimates that if the Real Property is sold at a "fire sale" the proceeds generated would be used to satisfy the claims of the Secured Tax Claims and a portion of BB&T's claim. No funds would be available to disburse to unsecured creditors or Holders of Interests.

## XI.    <u>Procedures for Treating and Resolving Disputed Claims</u>

### A.    <u>Objection To Claims</u>

The Plan provides that the Reorganized Debtor shall be entitled to object to Claims, <u>provided</u>, <u>however</u>, that the Debtor and Reorganized Debtor shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that are Allowed by the express terms of the Plan.  Any objections to Claims must be filed by the Claims Objection Deadline.  The Plan defines the Claims Objection Deadline to be the later of the first Business Day which is (i) sixty (60) days after the Effective Date, or (ii) such other time as may be ordered by the Bankruptcy Court, as such dates may be from time to time extended by the Bankruptcy Court without further notice to parties in interest.

### B.    <u>No Distributions Pending Allowance</u>

Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

### C.    <u>Estimation of Claims</u>

The Debtor or the Reorganized Debtor, as the case may be, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to the Bankruptcy

Code regardless of whether the Debtor or the Reorganized Debtor have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (and after the Effective Date, the Reorganized Debtor) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

### D.    Resolution of Claims Objections

On and after the Effective Date, the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court.

## XII.    Conditions Precedent to the Effective Date

### A.    Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Article 11.3 of the Plan:  (a) the Bankruptcy Court shall have approved a Disclosure Statement with respect to the Plan; and (b) the Confirmation Order shall have been signed by the Bankruptcy Court and entered on the docket of the Bankruptcy Court.

### B.    Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.2 of the Plan.

    (a)    The Confirmation Order shall not have been vacated, reversed or modified and, as of the Effective Date, shall not be stayed.

    (b)    All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan shall be in form and substance that is acceptable to the Debtor, in its reasonable discretion.

    (c)    The Debtor shall have received any necessary authorization, consent and/or regulatory approval.

Under the Plan, each of the conditions set forth above may be waived, in whole or in part, by the Debtor without any notice to any other parties in interest or the Bankruptcy Court and

without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtor in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtor in their sole discretion).  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## XIII.    Certain Effects of Confirmation

### A.    Vesting of the Debtor's Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Debtor in the same right title and interest the Debtor held as of the Filing Date, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in the Plan.  As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

### B.    Discharge of the Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtor, the Reorganized Debtor or its Estate that arose prior to the Effective Date.

### C.    Release by Debtor of Certain Parties

Except as otherwise specifically provided in the Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, as of the Effective Date, the Debtor, in its individual capacity and as a Debtor in possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on or relating to, in whole or in part, the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims or Interests prior to or in the bankruptcy case, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring or the bankruptcy cases.    The Reorganized Debtor, and other potential

representatives of the Estate shall be bound, to the same extent the Debtor is bound, by all of the releases set forth above.

The Released Parties include (i) all employees, consultants, agents, financial advisors, attorneys and other representatives of the Debtor who served in such capacity on or subsequent to the Filing Date, in each case in their capacity as such.

### D. **Release by Holders of Claims and Interests**

The Plan contains the following language regarding releases of claims by Holders of Claims and Interests:

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, ON THE EFFECTIVE DATE, (a) EACH PERSON THAT VOTES TO ACCEPT THIS PLAN OR IS PRESUMED TO HAVE VOTED FOR THIS PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE; AND (b) TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE EFFECTIVE DATE, EACH ENTITY (OTHER THAN A DEBTOR), THAT HAS HELD, HOLDS OR MAY HOLD A CLAIM OR INTEREST (EACH, A "RELEASE OBLIGOR"), IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTOR AND THE REORGANIZED DEBTOR UNDER THIS PLAN AND THE CASH, NEW MEMBER INTERESTS, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH THIS PLAN, SHALL HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE DEBTOR AND THE REORGANIZED DEBTOR FROM ANY CLAIM OR CAUSE OF ACTION EXISTING AS OF THE EFFECTIVE DATE ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE SUBJECT MATTER OF, OR THE TRANSACTION OR EVENT GIVING RISE TO, THE CLAIM OF SUCH RELEASE OBLIGOR, AND ANY ACT, OMISSION, OCCURRENCE, OR EVENT IN ANY MANNER RELATED TO SUCH SUBJECT MATTER, TRANSACTION OR OBLIGATION.**

### E. **Setoffs**

The Debtor may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against such entity, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such entity.

### F. **Injunction**

The satisfaction, release, and discharge pursuant to Article X of the Plan shall act as a permanent injunction against any Person commencing or continuing any action, employment of

process, or act to collect, offset, or recover any Claim or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

### G.    Miscellaneous Plan Provisions

#### 1.    Modification of Plan

The Debtor shall be allowed to modify the Plan pursuant to section 1127 of the Bankruptcy Code to the extent applicable law permits.  Subject to the limitations contained in the Plan, pursuant to Article 13.1 of the Plan, the Debtor may modify the Plan, before or after confirmation, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the Modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.  In the event of any modification on or before confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes.  The Debtor reserves the right in accordance with section 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date.

#### 2.    Retention of Jurisdiction

The Plan provides that subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

(a)    to adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established in the Plan;

(b)    To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated claim, to establish the amount of any reserve required to be withheld from any distribution under the Plan on account of any disputed, contingent or unliquidated claim;

(c)    To resolve all matters related to the rejection, assumption and/or assignment of any Executory Contract or Unexpired Lease of the Debtor;

(d)    To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by the Debtor and/or the Reorganized Debtor;

(e)    To hear and rule upon all applications for Professional Compensation;

(f)    To remedy any defect or omission or reconcile any inconsistency in the Plan, as may be necessary to carry out the intent and purpose of the Plan;

(g)    To construe or interpret any provisions in the Plan and to issue such orders as may be necessary for the implementation, execution and consummation of the Plan, to the extent authorized by the Bankruptcy Code;

(h)    To adjudicate controversies arising out of the administration of the Estate or the implementation of the Plan;

(i)    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of the Plan, including the Distribution of funds from the Estate and the payment of claims;

(j)    To determine any suit or proceeding brought by the Debtor and/or the Reorganized Debtor to recover property under any provisions of the Bankruptcy Code;

(k)    To hear and determine any tax disputes concerning the Debtor and to determine and declare any tax effects under the Plan;

(l)    To determine such other matters as may be provided for in the Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

(m)    To determine any controversies, actions or disputes that may arise under the provisions of the Plan, or the rights, duties or obligations of any Person under the provisions of the Plan;

(n)    To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of, or in connection with, any agreement pursuant to which the Debtor sold any of its assets during the Bankruptcy Cases; and

(o)    To enter a final decree.

## XIV.  **Confirmation and Consummation Procedure**

### A.  **General Information**

All creditors whose Claims are Impaired by the Plan may cast their votes for or against the Plan. As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims vote to accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by Holders of at least

two-thirds of the dollar amount of the class <u>and</u> by more than one-half in number of Claims. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan. Voting is accomplished by completing, dating, signing and returning the ballot form (the "Ballot") by the Voting Deadline. Ballots will be distributed to all creditors entitled to vote on the Plan and is part of the Solicitation Package accompanying the Disclosure Statement. The Ballot indicates (i) where the Ballot is to be filed and (ii) the deadline by which creditors must return their Ballots.

### B.    <u>Solicitation of Acceptances</u>

This Disclosure Statement has been approved by the Court as containing "adequate information" to permit creditors and equity interest holders to make an informed decision whether to accept or reject the Plan. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to, or concurrently with, such solicitation.

### C.    <u>Acceptances Necessary to Confirm the Plan</u>

At the Confirmation Hearing, the Court shall determine, among other things, whether the Plan has been accepted by the Debtor's creditors. The Voting Classes will be deemed to accept the Plan if at least two-third in amount and more than one-half in number of the Claims in each class vote to accept the Plan. Furthermore, unless there is unanimous acceptance of the Plan by the Voting Classes, the Court must also determine that any non-accepting Class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such Class member would receive or retain if the Debtor were liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

### D.    <u>Confirmation of Plan Pursuant to Section 1129(b)</u>

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all Impaired classes. To confirm the Plan without the requisite number of acceptances of each Impaired Class, the Court must find that at least one Impaired Class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to any Impaired Class that does not accept the Plan. Class 5 is deemed to reject the Plan. Accordingly, if any Impaired Class votes to accept the Plan, the Debtor will seek to confirm the Plan under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

### E.    <u>Considerations Relevant to Acceptance of the Plan</u>

The Debtor's recommendation that all Creditors vote to accept the Plan is premised upon the Debtor's view that the Plan is preferable to other alternatives for liquidation of the Debtor's estate. It appears unlikely to the Debtor that an alternate plan of reorganization or liquidation can be proposed that would provide for payments in an amount equal or greater than the amounts

proposed under the Plan.  If the Plan is not accepted, it is likely that the interests of all creditors will be further diminished.

Respectfully submitted this 19th day of February, 2010.

**HIDDEN LAKE ACADEMY, INC.**

By:  _/s/Leonard Buccellato_____
Its: Chief Executive Officer

Debtor and Debtor in Possession

**ELLENBERG, OGIER, ROTHSCHILD & ROSENFELD, PC**
170 Mitchell Street, SW
Atlanta, GA 30303
(404) 525-4000 Phone
(404) 526-8855 Facsimile
bem@eorrlaw.com

EXHIBIT "A"

11:02 AM

02/05/10

Accrual Basis

# Hidden Lake Academy
# Profit & Loss
### October through December 2009

|  | Oct - Dec 09 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| HLA Lease Payment | 38,400.00 |
| Management Fees | 74,453.64 |
| **Total Income** | 112,853.64 |
| **Expense** | |
| Bank Service Charges | 12.50 |
| Insurance - Health | 0.00 |
| Interest - B B & T Mortgage | 60,000.00 |
| Interest Expense - Other | 588.83 |
| Legal | 975.00 |
| License | 127.00 |
| **Payroll Expenses** | |
| P/R - Academics | 16,421.04 |
| P/R - Admin | 8,829.33 |
| P/R - Counseling | 20,734.00 |
| P/R - HR | 12,166.68 |
| P/R - Operations | 5,062.50 |
| **Total Payroll Expenses** | 63,213.55 |
| Payroll processing | 527.02 |
| Payroll tax - 940 | 931.76 |
| **Payroll Tax - 941** | |
| Tax - Admin | 1,666.67 |
| Tax - Counseling | 4,146.80 |
| Tax - Operations | 1,012.50 |
| Payroll Tax - 941 - Other | 4,414.12 |
| **Total Payroll Tax - 941** | 11,240.09 |
| Payroll Tax - Georgia DOL Unemp | 1.50 |
| Taxes - Real Estate | 27,687.17 |
| **Total Expense** | 165,304.42 |
| **Net Ordinary Income** | -52,450.78 |
| **Net Income** | **-52,450.78** |

3:09 PM

02/11/10

Accrual Basis

# Hidden Lake Academy
## Profit & Loss
### January 2010

|  | Jan 10 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| HLA Lease Payment | 20,000.00 |
| Management Fees | 8,233.00 |
| **Total Income** | 28,233.00 |
| **Expense** | |
| Computer and Internet Expenses | 1,250.00 |
| Insurance - other | 5,702.03 |
| Interest - B B & T Mortgage | 20,000.00 |
| Interest Expense - Other | 1,124.05 |
| Payroll tax - 940 | 183.68 |
| Payroll Tax - Georgia DOL Unemp | 1.05 |
| **Total Expense** | 28,260.81 |
| **Net Ordinary Income** | -27.81 |
| **Net Income** | -27.81 |

EXHIBIT "B"

Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

► Do not file this form unless the corporation has filed or is
attaching Form 2553 to elect to be an S corporation.
► See separate instructions.

OMB No. 1545-0130

**2008**

For calendar year 2008 or tax year beginning , 2008, ending ,

| | | | |
|---|---|---|---|
| A  S election effective date | Use the IRS label. Other- wise, print or type. | HIDDEN LAKE ACADEMY, INC. 830 HIDDEN LAKE ROAD DAHLONEGA, GA 30533 | D  Employer identification number  58-2124642 |
| 8/04/1994 | | | E  Date incorporated  8/01/1994 |
| B  Business activity code number (see instrs)  611000 | | | F  Total assets (see instructions) |
| C  Check if Sch M-3 attached | | | $  1,173,889. |

G  Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No  If 'Yes,' attach Form 2553 if not previously filed

H  Check if: (1) ☐ Final return  (2) ☐ Name change  (3) ☐ Address change
(4) ☐ Amended return  (5) ☐ S election termination or revocation

I  Enter the number of shareholders who were shareholders during any part of the tax year .................... ► 1

**Caution.** Include *only* trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | | |
|---|---|---|---|---|---|
| **I N C O M E** | 1a | Gross receipts or sales | 659,662. | b Less returns and allowances | c Bal ► | 1c | 659,662. |
| | 2 | Cost of goods sold (Schedule A, line 8) .................... | | 2 | |
| | 3 | Gross profit. Subtract line 2 from line 1c .................... | | 3 | 659,662. |
| | 4 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) .... | | 4 | |
| | 5 | Other income (loss) (attach statement) .................... | | 5 | |
| | 6 | **Total income (loss).** Add lines 3 through 5 .................... ► | | 6 | 659,662. |
| **D E D U C T I O N S (SEE INSTRS)** | 7 | Compensation of officers .................... | | 7 | |
| | 8 | Salaries and wages (less employment credits) .................... | | 8 | 552,064. |
| | 9 | Repairs and maintenance .................... | | 9 | |
| | 10 | Bad debts .................... | | 10 | |
| | 11 | Rents .................... | | 11 | |
| | 12 | Taxes and licenses .................... SEE STATEMENT 1 | | 12 | 66,788. |
| | 13 | Interest .................... | | 13 | |
| | 14 | Depreciation not claimed on Schedule A or elsewhere on return (attach Form 4562) | | 14 | 33,081. |
| | 15 | Depletion (Do not deduct oil and gas depletion.) .................... | | 15 | |
| | 16 | Advertising .................... | | 16 | 1,000. |
| | 17 | Pension, profit-sharing, etc, plans .................... | | 17 | |
| | 18 | Employee benefit programs .................... | | 18 | |
| | 19 | Other deductions (attach statement) .................... SEE STATEMENT 2 | | 19 | 14,393. |
| | 20 | **Total deductions.** Add lines 7 through 19 .................... ► | | 20 | 667,326. |
| | 21 | **Ordinary business income (loss).** Subtract line 20 from line 6 .................... | | 21 | -7,664. |
| **T A X A N D P A Y M E N T S** | 22a | Excess net passive income or LIFO recapture tax (see instructions) | 22a | | |
| | b | Tax from Schedule D (Form 1120S) .................... | 22b | | |
| | c | Add lines 22a and 22b (see instructions for additional taxes) .................... | | 22c | |
| | 23a | 2008 estimated tax payments and 2007 overpayment credited to 2008 .... | 23a | | |
| | b | Tax deposited with Form 7004 .................... | 23b | | |
| | c | Credit for federal tax paid on fuels (attach Form 4136) .................... | 23c | | |
| | d | Add lines 23a through 23c .................... | | 23d | |
| | 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ... ► ☐ | | 24 | |
| | 25 | Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed ... | | 25 | 0. |
| | 26 | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid .... | | 26 | |
| | 27 | Enter amount from line 26 Credited to 2009 estimated tax | Refunded | 27 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

► Signature of officer      Date      ► Title

May the IRS discuss this return with the preparer shown below (see instructions)?  ☒ Yes  ☐ No

| **Paid Preparer's Use Only** | Preparer's signature ► | DAVID B. FLOYD, CPA | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code ► | DAVID B. FLOYD CPA, P.C. 300 COLONIAL CENTER PKWY STE 240 ROSWELL, GA 30076 | | EIN  58-2071491 Phone no.  (770) 650-6824 | |

BAA  For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.  SPSA0105L  12/30/08  Form **1120S** (2008)

State Return

## Schedule A    Cost of Goods Sold (see instructions)

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs *(attach statement)* | 4 | |
| 5 | Other costs *(attach statement)* | 5 | |
| 6 | **Total.** Add lines 1 through 5 | 6 | |
| 7 | Inventory at end of year | 7 | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | |

9a Check all methods used for valuing closing inventory:

    (i) ☐ Cost as described in Regulations section 1.471-3

    (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

    (iii) ☐ Other (Specify method used and attach explanation.) _____

  b Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) . . . . . . . . . . ▶ ☐

  c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . ▶ ☐

  d If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . | 9d | |

  e If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? . . . . . . . . . ☐ Yes ☐ No

  f Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If 'Yes,' attach explanation. . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

## Schedule B    Other Information (see instructions)

| | | Yes | No |
|---|---|---|---|
| 1 | Check accounting method: a ☒ Cash  b ☐ Accrual  c ☐ Other (specify) ▶ | | |
| 2 | See the instructions and enter the: | | |
| | a Business activity ▶ SCHOOL MGMT    b Product or service ▶ MANAGEMENT | | |
| 3 | At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If 'Yes,' attach a statement showing: **(a)** name and employer identification number (EIN), **(b)** percentage owned, and **(c)** if 100% owned, was a QSub election made? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| 4 | Has this corporation filed, or is it required to file, a return under section 6111 to provide information on any reportable transaction? | | X |
| 5 | Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . ▶ ☐ If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount Instruments. | | |
| 6 | If the corporation: **(a)** was a C corporation before it elected to be an S corporation **or** the corporation acquired an asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a C corporation **and (b)** has net unrealized built-in gain (defined in section 1374(d)(1)) in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years . . . . . . . . . . . . . . . . ▶ $ _____ | | |
| 7 | Enter the accumulated earnings and profits of the corporation at the end of the tax year. . . . . . . . . $ _____ | | |
| 8 | Are the corporation's total receipts *(see instructions)* for the tax year **and** its total assets at the end of the tax year less than $250,000? If 'Yes,' the corporation is not required to complete Schedules L and M-1. . . . . . . . | | X |

## Schedule K    Shareholders' Pro Rata Share Items

| | | | Total amount |
|---|---|---|---|
| **I N C O M E (L O S S)** | 1 Ordinary business income (loss) (page 1, line 21) . . . . . . . . . . . . . . . | 1 | -7,664. |
| | 2 Net rental real estate income (loss) *(attach Form 8825)* . . . . . . . . . . . | 2 | |
| | 3a Other gross rental income (loss) . . . . . . . . | 3a | | |
| | b Expenses from other rental activities *(attach statement)* . . . . | 3b | | |
| | c Other net rental income (loss). Subtract line 3b from line 3a | 3c | |
| | 4 Interest income . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
| | 5 Dividends:  a Ordinary dividends . . . . . . . . . . . . . . . . . | 5a | |
| | b Qualified dividends . . . . . . . . . . . . . . | 5b | | |
| | 6 Royalties . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | |
| | 7 Net short-term capital gain (loss) *(attach Schedule D (Form 1120S))* . . . . . . | 7 | |
| | 8a Net long-term capital gain (loss) *(attach Schedule D (Form 1120S))* . . . . . . | 8a | |
| | b Collectibles (28%) gain (loss) . . . . . . . . | 8b | | |
| | c Unrecaptured section 1250 gain *(attach statement)* . . . . . . | 8c | | |
| | 9 Net section 1231 gain (loss) *(attach Form 4797)* . . . . . . . . . . . . . . | 9 | |
| | 10 Other income (loss) *(see instructions)* . . . . . . . . . . . . . . . . . | 10 | |

Form **1120S** (2008)

SPSA0112L   12/30/08

State Return

| | Shareholders' Pro Rata Share Items (continued) | | Total amount |
|---|---|---|---|
| **Deductions** | 11  Section 179 deduction *(attach Form 4562)* | 11 | |
| | 12a Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 3 | 12a | 505. |
| | b Investment interest expense. | 12b | |
| | c Section 59(e)(2) expenditures  (1) Type ▶ _ _ _ _ _ _ _ _ _ _ _ _ (2) Amount ▶ | 12c (2) | |
| | d Other deductions *(see instructions)*  Type ▶ | 12d | |
| **Credits** | 13a Low-income housing credit (section 42(j)(5)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13a | |
| | b Low-income housing credit (other) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13b | |
| | c Qualified rehabilitation expenditures (rental real estate) *(attach Form 3468)* . . . . . . . . . . | 13c | |
| | d Other rental real estate credits *(see instrs)*   Type ▶ _ _ _ _ _ _ _ _ _ _ _ | 13d | |
| | e Other rental credits *(see instrs)*  Type ▶ _ _ _ _ _ _ _ _ _ _ _ | 13e | |
| | f  Alcohol and cellulosic biofuel fuels credit *(attach Form 6478)* . . . . . . . . . . . . . . . . . . | 13f | |
| | g Other credits *(see instructions)* . . . . . .  Type ▶ | 13g | |
| **Foreign Trans-actions** | 14a Name of country or U.S. possession . . . . . . ▶ _ _ _ _ _ _ _ _ _ _ | | |
| | b Gross income from all sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14b | |
| | c Gross income sourced at shareholder level . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14c | |
| | *Foreign gross income sourced at corporate level* | | |
| | d Passive category. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14d | |
| | e General category. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14e | |
| | f  Other *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14f | |
| | *Deductions allocated and apportioned at shareholder level* | | |
| | g Interest expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14g | |
| | h Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14h | |
| | *Deductions allocated and apportioned at corporate level to foreign source income* | | |
| | i  Passive category. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14i | |
| | j  General category. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14j | |
| | k Other *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14k | |
| | *Other information* | | |
| | l  Total foreign taxes (check one): ▶ ☐ Paid   ☐ Accrued . . . . . . . . . . . . | 14l | |
| | m Reduction in taxes available for credit<br>*(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14m | |
| | n Other foreign tax information *(attach statement)* | | |
| **Alternative Minimum Tax (AMT) Items** | 15a Post-1986 depreciation adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15a | 407. |
| | b Adjusted gain or loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15b | |
| | c Depletion (other than oil and gas) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15c | |
| | d Oil, gas, and geothermal properties — gross income . . . . . . . . . . . . . . . . . . . . . | 15d | |
| | e Oil, gas, and geothermal properties — deductions . . . . . . . . . . . . . . . . . . . . . . | 15e | |
| | f  Other AMT items *(attach statement)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15f | |
| **Items Affecting Shareholder Basis** | 16a Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16a | |
| | b Other tax-exempt income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16b | |
| | c Nondeductible expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16c | |
| | d Property distributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16d | |
| | e Repayment of loans from shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16e | |
| **Other Information** | 17a Investment income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17a | |
| | b Investment expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17b | |
| | c Dividend distributions paid from accumulated earnings and profits . . . . . . . . . . . . . . | 17c | |
| | d Other items and amounts<br>*(attach statement)* | | |
| **Reconciliation** | 18  Income/loss reconciliation. Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and lines 14l . . . | 18 | −8,169. |

BAA                                                                                               Form 1120S (2008)

SPSA0134L   06/25/08

## State Return

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | Assets | (a) | (b) | (c) | (d) |
| 1 | Cash | | -15,134. | | -10,019. |
| 2a | Trade notes and accounts receivable | | | | |
| b | Less allowance for bad debts | | | | |
| 3 | Inventories | | | | |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | |
| 6 | Other current assets (attach stmt) SEE ST 4 | | | | 500. |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach statement) | | | | |
| 10a | Buildings and other depreciable assets | 1,287,066. | | 1,287,066. | |
| b | Less accumulated depreciation | 334,786. | 952,280. | 367,938. | 919,128. |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | | | | |
| 12 | Land (net of any amortization) | | 245,586. | | 245,586. |
| 13a | Intangible assets (amortizable only) | 21,035. | | 21,035. | |
| b | Less accumulated amortization | 1,316. | 19,719. | 2,341. | 18,694. |
| 14 | Other assets (attach stmt) | | | | |
| 15 | Total assets | | 1,202,451. | | 1,173,889. |
| | Liabilities and Shareholders' Equity | | | | |
| 16 | Accounts payable | | 48,271. | | 74,028. |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | 43,000. | | 43,000. |
| 18 | Other current liabilities (attach stmt) SEE ST 5 | | 142,511. | | 296,767. |
| 19 | Loans from shareholders | | 39,200. | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | 1,504,282. | | 1,508,284. |
| 21 | Other liabilities (attach statement) SEE ST 6 | | 164,988. | | |
| 22 | Capital stock | | 500. | | 500. |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings | | -740,301. | | -748,690. |
| 25 | Adjustments to shareholders' equity (att stmt) | | | | |
| 26 | Less cost of treasury stock | | | | |
| 27 | Total liabilities and shareholders' equity | | 1,202,451. | | 1,173,889. |

| Schedule M-1 | Reconciliation of Income (Loss) per Books With Income (Loss) per Return | | |
|---|---|---|---|
| | Note: Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more — see instructions | | |
| 1 | Net income (loss) per books | -8,389. | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 4, 5a, 6, 7, 8a, 9, and 10, not recorded on books this year (itemize): | | |
| 3 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12, and 14l (itemize): | | |
| a | Depreciation $ 71. | | |
| b | Travel and entertainment $ | | |
| | SEE STATEMENT 7 149. | 220. | |
| 4 | Add lines 1 through 3 | -8,169. | |

| 5 | Income recorded on books this year not included on Schedule K, lines 1 through 10 (itemize): | |
|---|---|---|
| a | Tax-exempt interest. $ | |
| 6 | Deductions included on Schedule K, lines 1 through 12, and 14l, not charged against book income this year (itemize): | |
| a | Depreciation $ | |
| 7 | Add lines 5 and 6 | 0. |
| 8 | Income (loss) (Schedule K, ln 18). Ln 4 less ln 7 | -8,169. |

| Schedule M-2 | Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed (see instructions) | | | |
|---|---|---|---|---|
| | | (a) Accumulated adjustments account | (b) Other adjustments account | (c) Shareholders' undistributed taxable income previously taxed |
| 1 | Balance at beginning of tax year | -740,301. | | |
| 2 | Ordinary income from page 1, line 21 | | | |
| 3 | Other additions | | | |
| 4 | Loss from page 1, line 21 | ( 7,664.) | | |
| 5 | Other reductions SEE STATEMENT 8 | ( 505.) | | |
| 6 | Combine lines 1 through 5 | -748,470. | | |
| 7 | Distributions other than dividend distributions | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 | -748,470. | | |

SPSA0134L  06/25/03

Form 1120S (2008)

State Return

**Schedule K-1**
**(Form 1120S)**
**2008**

Department of the Treasury
Internal Revenue Service

For calendar year 2008, or tax
year beginning _____ , 2008
ending _____

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0130

## Shareholder's Share of Income, Deductions, Credits, etc. ▸ See page 2 of form and separate instructions.

### Part III  Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) -7,664. | 13 | Credits |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | | |
| 4 | Interest income | | |
| 5a | Ordinary dividends | | |
| 5b | Qualified dividends | 14 | Foreign transactions |
| 6 | Royalties | | |
| 7 | Net short-term capital gain (loss) | | |
| 8a | Net long-term capital gain (loss) | | |
| 8b | Collectibles (28%) gain (loss) | | |
| 8c | Unrecaptured section 1250 gain | | |
| 9 | Net section 1231 gain (loss) | | |
| 10 | Other income (loss) | 15 A | Alternative minimum tax (AMT) items  407. |
| 11 | Section 179 deduction | 16 | Items affecting shareholder basis |
| 12 A | Other deductions  505. | | |
| | | 17 | Other information |

### Part I  Information About the Corporation

A  Corporation's employer identification number
58-2124642

B  Corporation's name, address, city, state, and ZIP code
HIDDEN LAKE ACADEMY, INC.
830 HIDDEN LAKE ROAD
DAHLONEGA, GA 30533

C  IRS Center where corporation filed return
CINCINNATI, OH

### Part II  Information About the Shareholder

D  Shareholder's identifying number
/

E  Shareholder's name, address, city, state, and ZIP code
LEONARD A. BUCCELLATO
3340 PEACHTREE RD   STE 1125
ATLANTA, GA 30326

F  Shareholder's percentage of stock
ownership for tax year . . . . . . . . . . . . . . . . . .   100 %

F
O
R

I
R
S

U
S
E

O
N
L
Y

*See attached statement for additional information.

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1120S.

Schedule K-1 (Form 1120S) 2008

SHAREHOLDER 1

SPSA0412L   12/10/08

State Return

671108

## Schedule K-1
### (Form 1120S)

**2008**

For calendar year 2008, or tax

Department of the Treasury
Internal Revenue Service

year beginning _____, 2008

ending _____

OMB No. 1545-0130

| ☐ Final K-1 | ☐ Amended K-1 |
|---|---|

### Part III — Shareholder's Share of Current Year Income, Deductions, Credits, and Other Items

## Shareholder's Share of Income, Deductions, Credits, etc.  ☞ See page 2 of form and separate instructions.

### Part I — Information About the Corporation

**A** Corporation's employer identification number
58-2124642

**B** Corporation's name, address, city, state, and ZIP code
HIDDEN LAKE ACADEMY, INC.
830 HIDDEN LAKE ROAD
DAHLONEGA, GA 30533

**C** IRS Center where corporation filed return
CINCINNATI, OH

### Part II — Information About the Shareholder

**D** Shareholder's identifying number

**E** Shareholder's name, address, city, state, and ZIP code
LEONARD A. BUCCELLATO
3340 PEACHTREE RD    STE 1125
ATLANTA, GA 30326

**F** Shareholder's percentage of stock
ownership for tax year . . . . . . . . . . . . . . .    100 %

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | -7,664. | 13 | Credits |
| 2 | Net rental real estate income (loss) | | | |
| 3 | Other net rental income (loss) | | | |
| 4 | Interest income | | | |
| 5a | Ordinary dividends | | | |
| 5b | Qualified dividends | | 14 | Foreign transactions |
| 6 | Royalties | | | |
| 7 | Net short-term capital gain (loss) | | | |
| 8a | Net long-term capital gain (loss) | | | |
| 8b | Collectibles (28%) gain (loss) | | | |
| 8c | Unrecaptured section 1250 gain | | | |
| 9 | Net section 1231 gain (loss) | | | |
| 10 | Other income (loss) | | 15 | Alternative minimum tax (AMT) items |
| | | | A | 407. |
| 11 | Section 179 deduction | | 16 | Items affecting shareholder basis |
| 12 | Other deductions | | | |
| A | 505. | | | |
| | | | 17 | Other information |

*See attached statement for additional information.

F
O
R

I
R
S

U
S
E

O
N
L
Y

BAA  For Paperwork Reduction Act Notice, see Instructions for Form 1120S.

Schedule K-1 (Form 1120S) 2008

SHAREHOLDER 1

SPSA0412L  12/10/08

EXHIBIT "C"

# Hidden Lake Academy  Budget

| | Jan 2010 | Feb 2010 | Mar 2010 | April 2010 | May 2010 | June 2010 | July 2010 | Aug 2010 |
|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | |
| Rent from | 20,000 | 20,000 | 20,000 | 66,551 | 66,551 | 66,551 | 66,551 | 66,551 |
| Manageme | 8,233 | 8,233 | 8,233 | 8,233 | 8,233 | 8,233 | 8,233 | 8,233 |
| **Total Inco** | **28,233** | **28,233** | **28,233** | **74,784** | **74,784** | **74,784** | **74,784** | **74,784** |
| **ement expenses** | | | | | | | | |
| | | | | | | | | |
| **Dell equip** | **1,250** | **1,250** | **1,250** | **1,250** | **1,250** | **1,250** | **1,250** | **1,250** |
| **Property I** | **4,983** | **4,983** | **4,983** | **4,983** | **4,983** | **4,983** | **4,983** | **4,983** |
| **Property ta** | **2,000** | **2,000** | **2,000** | **2,000** | **2,000** | **2,000** | **2,000** | **2,000** |
| | | | | | | | | |
| **Total Mana** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** |
| | | | | | | | | |
| **ayment and finance** | | | | | | | | |
| Repaymen | 20,000 | 20,000 | 20,000 | 46,930 | 46,930 | 46,930 | 46,930 | 46,930 |
| Auto financing GMAC | | | | 1,170 | 1,170 | 1,170 | 1,170 | 1,170 |
| Repayment of debit  Morris Law Firm | | | | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| Tax claim Lumpkin County | | | | 1,431 | 1,431 | 1,431 | 1,431 | 1,431 |
| Tax claim IRS, Dept labor, GA IRS | | | | 9,833 | 9,833 | 9,833 | 9,833 | 9,833 |
| Repayment unsecured claims | | | | 4,547 | 4,547 | 4,547 | 4,547 | 4,547 |
| **Total debi** | **20,000** | **20,000** | **20,000** | **66,551** | **66,551** | **66,551** | **66,551** | **66,551** |
| | | | | | | | | |
| **Total Expe** | 28,233 | 28,233 | 28,233 | 74,784 | 74,784 | 74,784 | 74,784 | 74,784 |
| | | | | | | | | |
| | | | | | | | | |
| **Net Incom** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

| 2010 | | | | |
|---|---|---|---|---|
| **Sept** | **Oct** | **Nov** | **Dec** | **YTD** |
| **2010** | **2010** | **2010** | **2010** | **2,010** |
| | | | | |
| 66,551 | 66,551 | 66,551 | 66,551 | 658,959 |
| 8,233 | 8,233 | 8,233 | 8,233 | 98,796 |
| **74,784** | **74,784** | **74,784** | **74,784** | **757,755** |
| | | | | |
| | | | | |
| **1,250** | **1,250** | **1,250** | **1,250** | 15,000 |
| **4,983** | **4,983** | **4,983** | **4,983** | 59,796 |
| **2,000** | **2,000** | **2,000** | **2,000** | 24,000 |
| | | | | |
| **8,233** | **8,233** | **8,233** | **8,233** | **98,796** |
| | | | | |
| | | | | |
| 46,930 | 46,930 | 46,930 | 46,930 | 482,370 |
| 1,170 | 1,170 | 1,170 | 1,170 | 10,530 |
| 2,640 | 2,640 | 2,640 | 2,640 | 23,760 |
| 1,431 | 1,431 | 1,431 | 1,431 | 12,879 |
| 9,833 | 9,833 | 9,833 | 9,833 | 88,497 |
| 4,547 | 4,547 | 4,547 | 4,547 | 40,923 |
| **66,551** | **66,551** | **66,551** | **66,551** | **658,959** |

| | | | | |
|---|---|---|---|---|
| **74,784** | **74,784** | **74,784** | **74,784** | **757,755** |
| | | | | |
| | | | | |
| **0** | **0** | **0** | **0** | **0** |

EXHIBIT "D"

# Ridge Creek Budget 2010

| | Jan | Feb | Mar | April | May | June | July | Aug. | Sept | Oct. | Nov | Dec. | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2,010 |
| Days per Month | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 365 |
| Students year end 2009 | 40 | | | | | | | | | | | | |
| New Students | 6 | 7 | 7 | 7 | 7 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 76 |
| Graduating Students | 6 | | | | 4 | | | 16 | | | | 10 | 36 |
| Total Students | 40 | 47 | 54 | 61 | 64 | 70 | 76 | 66 | 72 | 78 | 84 | 80 | |
| | | | | | | | | | | | | | |
| Tuition per Student @ $4,000 average/ month | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | |
| | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | |
| **Tuition** | **160,000** | **188,000** | **216,000** | **244,000** | **256,000** | **280,000** | **304,000** | **264,000** | **288,000** | **312,000** | **336,000** | **320,000** | **3,168,000** |
| | | | | | | | | | | | | | |
| **Additional Income** | | | | | | | | | | | | | |
| ACT | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| SAT | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Academics - Other | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| **Total Academics** | **125** | **125** | **125** | **125** | **125** | **125** | **125** | **125** | **125** | **125** | **125** | **125** | **1,500** |
| Computer fees | 3,600 | 4,200 | 4,200 | 4,200 | 4,200 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 45,600 |
| Credit Card Fee | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Haircut | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Horseback Riding Program | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 | 28,800 |
| Laundry @ $40/mo | 1,600 | 1,880 | 2,160 | 2,440 | 2,560 | 2,800 | 3,040 | 2,640 | 2,880 | 3,120 | 3,360 | 3,200 | 31,680 |
| Late Fees | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Psychological Testing (20% new students) | 3,360 | 3,920 | 3,920 | 3,920 | 3,920 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 42,560 |
| Shipping / Postage / Fed-Ex | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 3,480 |
| **Travel** | | | | | | | | | | | | | |
| Break Transportation | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Inside Dahlonega | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Outside Dahlonega | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| **Total Travel** | **450** | **450** | **450** | **450** | **450** | **450** | **450** | **450** | **450** | **450** | **450** | **450** | **5,400** |
| **Uniforms** | **5,400** | **6,300** | **6,300** | **6,300** | **5,400** | **5,400** | **5,400** | **5,400** | **5,400** | **5,400** | **5,400** | **5,400** | **68,400** |
| **Total Income** | **177,700** | **208,040** | **236,320** | **264,600** | **276,720** | **298,900** | **323,140** | **282,740** | **306,980** | **331,220** | **355,460** | **339,300** | **3,401,120** |
| **Payroll** | | | | | | | | | | | | | |
| P/R Academics | 24,132 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 19,632 | 240,080 |
| P/R - Administration | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 15,258 | 183,100 |
| P/R - Admissions | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 2,479 | 29,748 |
| P/R - Counselors | 21,248 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 18,758 | 227,590 |
| P/R - Operations & IT | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 8,508 | 102,098 |
| P/R - Recreation | 12,630 | 12,630 | 12,630 | 14,630 | 14,630 | 14,630 | 14,630 | 14,630 | 14,630 | 16,630 | 16,630 | 16,630 | 175,560 |
| P/R-Security | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 4,445 | 53,340 |
| P/R Wilderness | 11,681 | 11,681 | 11,681 | 13,681 | 13,681 | 13,681 | 13,681 | 13,681 | 13,681 | 15,681 | 15,681 | 15,681 | 164,171 |
| **Total Payroll** | **100,381** | **93,391** | **93,391** | **97,392** | **97,392** | **97,392** | **97,392** | **97,392** | **97,392** | **101,392** | **101,392** | **101,392** | **1,175,687** |
| **Payroll Taxes** | | | | | | | | | | | | | |
| Payroll Taxes - Unemployment | | | | | | | | | | | | | |
| Payroll taxes federal | | | | | | | | | | | | | |
| Benefits | | | | | | | | | | | | | |
| **Total Taxes & Benefits @ 20%** | **20,076** | **18,678** | **18,678** | **19,478** | **19,478** | **19,478** | **19,478** | **19,478** | **19,478** | **20,278** | **20,278** | **20,278** | **235,137** |
| **Benefits** | | | | | | | | | | | | | |
| **Total Payroll Expenses** | **120,457** | **112,069** | **112,069** | **116,870** | **116,870** | **116,870** | **116,870** | **116,870** | **116,870** | **121,670** | **121,670** | **121,670** | **1,410,824** |
| **Academic Expense** | | | | | | | | | | | | | |
| Academic Travel & Events | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 250 |
| Application fees | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Awards | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 120 |
| Testing School | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 9,600 |
| Academic Expense -Supplies | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |

# Ridge Creek Budget 2010

| | Jan | Feb | Mar | April | May | June | July | Aug. | Sept | Oct. | Nov | Dec. | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2010 | 2,010 |
| **Total Academic Expense** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **1,010** | **12,120** |
| **Administrative Expenses** | | | | | | | | | | | | | |
| **Accounting Services** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Bank Service Charges** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Business Licenses and Permits** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Charitable Contributions** | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| **Dues and Subscriptions** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| **Employee Appreciation** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| **Finance Charge** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Insurance Expense** | | | | | | | | | | | | | |
| General Liability Insurance | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 36,000 |
| Life and Disability Insurance | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| Auto Insurance | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 2,600 | 31,200 |
| Worker's Compensation | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 2,100 | 25,200 |
| Insurance Expense - Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Total Insurance Expense** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **8,400** | **100,800** |
| **Late Fee /Over limit Fee-** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Legal** | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| **Licenses and Fees** | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 1,080 |
| **Merchant Acct. Fees** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Office Supplies** | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| **Over limit Credit Card fee** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| **Postage and Delivery** | | | | | | | | | | | | | |
| Federal Express | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| UPS | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| USPS | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Postage and Delivery - Other | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 240 |
| **Total Postage & Delivery** | **445** | **445** | **445** | **445** | **445** | **445** | **445** | **445** | **445** | **445** | **445** | **445** | **5,340** |
| **Uniforms clothing** | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| **Wal-Mart** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Printing and Reproduction** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Professional Fees** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Spiritual Subcontractors** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| **Administrative Expenses - Other** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| **Total Administrative Expenses** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **11,560** | **138,720** |
| **Admissions** | | | | | | | | | | | | | |
| **Admissions - Consultant T & E** | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,800 |
| **Admissions - Staff T & E** | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| **Conference Registration Fee** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Admissions - Other** | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| **Total Admissions** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **1,675** | **20,100** |
| **Athletic Expense** | | | | | | | | | | | | | |
| **Athletic Travel Expense** | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| **Officials Expense** | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| **Tournament Fee & Memberships** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| **Total Athletic Expense** | **275** | **275** | **275** | **275** | **275** | **275** | **275** | **275** | **275** | **275** | **275** | **275** | **3,300** |
| **Counseling Expense** | | | | | | | | | | | | | |
| **ATOD** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Counseling Travel & Events** | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| **Total Counseling Expense** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **250** | **3,000** |
| **Dispensary Expense** | | | | | | | | | | | | | |
| **Haircut Expense** | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 300 |
| **Medical** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Student Care** | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 360 |

# Ridge Creek  Budget  2010

| | Jan 2010 | Feb 2010 | Mar 2010 | April 2010 | May 2010 | June 2010 | July 2010 | Aug. 2010 | Sept 2010 | Oct. 2010 | Nov 2010 | Dec. 2010 | YTD 2,010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dispensary Expense - Other | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 240 |
| **Total Dispensary Expense** | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 325 | 3,900 |
| **HR Expense** | | | | | | | | | | | | | |
| Emp Credit/Background checks | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Payroll Processing | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| HR Expense - Service | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 1,700 | 20,400 |
| **Total HR Expense** | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 2,050 | 24,600 |
| **Marketing Expense** | | | | | | | | | | | | | |
| Advertising, Promotion and WEB site | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Goodwill / Gifts | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| **Total Marketing Expense** | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 33,000 |
| **Miscellaneous Expense** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Operations Expense** | | | | | | | | | | | | | |
| **Automobile Expense** | | | | | | | | | | | | | |
| Gasoline - Bulk | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 15,000 |
| Vehicle finance expense | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| Vehicle Repair | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| **Total Automobile Expense** | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 2,750 | 33,000 |
| **Computer and Internet Expenses** | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 54,000 |
| Dorm supplies | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| **Equipment Rental** | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| **Exterminating** | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 4,320 |
| **Food and Cafeteria - Service** | 16,000 | 16,000 | 17,000 | 17,000 | 18,000 | 18,000 | 19,000 | 19,000 | 20,000 | 20,000 | 22,000 | 22,000 | 224,000 |
| **Food and Cafeteria Supplies** | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 9,000 |
| **Garbage Disposal** | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 10,800 |
| **Housekeeping Contract** | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Housekeeping/Janitorial Supply** | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| **Inspections** | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| **Landscaping and Grounds** | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| **Propane Gas** | 12,000 | 10,000 | 9,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 8,000 | 10,000 | 91,000 |
| **Repairs and Maintenance** | | | | | | | | | | | | | |
| Services - Bldg. | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Services - Equip. | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 4,200 |
| Supplies | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Repairs and Maintenance - Other | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| **Total Repairs and Maintenance** | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 | 16,200 |
| **Satellite** | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| **Telephone Expense** | | | | | | | | | | | | | |
| Cell Phone Service | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Windstream | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 43,200 |
| Telephone Expense - equipment lease | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 14,400 |
| **Total Telephone Expense** | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 61,200 |
| **Utilities - Electric** | | | | | | | | | | | | | |
| Utilities RCI Girls Dorm | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| Utilities RCI Admin/boys dorm | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 370 | 4,440 |
| Utilities 14401 Lodge | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 | 14,880 |
| Utilities 14402 sac | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 160 | 1,920 |
| Utilities 14403  Dorm A | 660 | 660 | 660 | 660 | 660 | 660 | 660 | 660 | 660 | 660 | 660 | 660 | 7,920 |
| Utilities 14407 New Maintenance | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Utilities 14410 dorm B | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 6,600 |
| Utilities 14411 Old Admin | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Utilities 14412 dorm C | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 8,880 |
| Utilities 14413 Pump House | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 2,460 |
| Utilities 14419 Len's House | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |

**Ridge Creek Budget 2010**

| | Jan 2010 | Feb 2010 | Mar 2010 | April 2010 | May 2010 | June 2010 | July 2010 | Aug. 2010 | Sept 2010 | Oct. 2010 | Nov 2010 | Dec. 2010 | YTD 2,010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utilities 14420 Gym | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 820 | 9,840 |
| Utilities 14426 counselor bldg | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 480 |
| Utilities 14428 sewer plant | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 3,240 |
| Utilities 14431 restrooms-soccer | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Utilities 14432 Swimming Pool | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 180 | 2,160 |
| Utilities 14433 Well Pump | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 720 |
| Utilities 14434 Administration | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 1,715 | 20,580 |
| Utilities - Electric - Other | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| **Total Utilities - Electric** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **7,660** | **91,920** |
| Water & Pump | | | | | | | | | | | | | |
| Sewer Plant Maint. & Supplies | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,800 |
| Water Testing | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,200 |
| **Total Water & Pump** | **750** | **750** | **750** | **750** | **750** | **750** | **750** | **750** | **750** | **750** | **750** | **750** | **9,000** |
| **Total Operations Expense** | **59,520** | **57,520** | **57,520** | **54,520** | **55,520** | **55,520** | **56,520** | **56,520** | **57,520** | **57,520** | **61,520** | **63,520** | **693,240** |
| Recreation Expense | | | | | | | | | | | | | |
| Rec Travel & Events | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,600 |
| Recreation equipment | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 600 |
| Stable and Horses | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 19,200 |
| Recreation Expense - Other | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,400 |
| **Total Recreation Expense** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **2,150** | **25,800** |
| | | | | | | | | | | | | | |
| **Management Fees from Hidden Lake** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **8,233** | **98,796** |
| **Rent Payment to Hidden Lake** | **20,000** | **20,000** | **20,000** | **66,551** | **66,551** | **66,551** | **66,551** | **66,551** | **66,551** | **66,551** | **66,551** | **66,551** | **658,959** |
| RCI delinquent taxes | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 3,775 | 45,300 |
| | | | | | | | | | | | | | |
| **Total Expenses** | **234,130** | **223,742** | **223,742** | **272,094** | **273,094** | **273,094** | **274,094** | **274,094** | **275,094** | **279,894** | **283,894** | **285,894** | **3,172,859** |
| | | | | | | | | | | | | | |
| **Net Income** | **(56,430)** | **(15,702)** | **12,578** | **(7,494)** | **3,626** | **25,806** | **49,046** | **8,646** | **31,886** | **51,326** | **71,566** | **53,406** | **228,261** |

EXHIBIT "E"

**Ridge Creek Inc**
**Proposed Budget  2011-2014**

| | Year 2011 | | | | Year 2012 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q-1 | Q-2 | Q-3 | Q-4 | Q-1 | Q-2 | Q-3 | Q-4 |
| | | | | | | | | |
| **Average number of students** | **80** | **85** | **89** | **95** | **99** | **104** | **109** | **113** |
| | | | | | | | | |
| **Income** | | | | | | | | |
| Tuition income | 1,056,000 | 1,122,000 | 1,174,800 | 1,254,000 | 1,366,200 | 1,435,200 | 1,504,200 | 1,559,400 |
| Other income | 79,200 | 84,150 | 88,110 | 94,050 | 102,465 | 107,640 | 112,815 | 116,955 |
| **Total income** | **1,135,200** | **1,206,150** | **1,262,910** | **1,348,050** | **1,468,665** | **1,542,840** | **1,617,015** | **1,676,355** |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Operating expenses | 635,400 | 654,462 | 674,096 | 694,319 | 715,148 | 736,603 | 758,701 | 781,462 |
| | | | | | | | | |
| Management Fees from Hidden Lake | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 |
| Rent Payment to Hidden Lake | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 |
| | | | | | | | | |
| **Total expenses** | **904,875** | **923,937** | **943,571** | **963,794** | **984,623** | **1,006,078** | **1,028,176** | **1,050,937** |
| | | | | | | | | |
| **Net Income** | **230,325** | **282,213** | **319,339** | **384,256** | **484,042** | **536,762** | **588,839** | **625,418** |

**Ridge Creek Inc**
**Proposed Budget  2011-2014**

| | Year 2013 | | | | Year 2014 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q-1 | Q-2 | Q-3 | Q-4 | Q-1 | Q-2 | Q-3 | Q-4 |
| | | | | | | | | |
| **Average number of students** | **117** | **120** | **124** | **129** | **133** | **138** | **144** | **150** |
| | | | | | | | | |
| **Income** | | | | | | | | |
| Tuition income | 1,614,600 | 1,656,000 | 1,711,200 | 1,780,200 | 1,915,200 | 1,987,200 | 2,073,600 | 2,160,000 |
| Other income | 121,095 | 124,200 | 128,340 | 133,515 | 143,640 | 149,040 | 155,520 | 162,000 |
| **Total income** | **1,735,695** | **1,780,200** | **1,839,540** | **1,913,715** | **2,058,840** | **2,136,240** | **2,229,120** | **2,322,000** |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Operating expenses | 804,906 | 829,053 | 853,924 | 879,542 | 905,928 | 933,106 | 961,100 | 989,932 |
| | | | | | | | | |
| Management Fees from Hidden Lake | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 | 76,479 |
| Rent Payment to Hidden Lake | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 | 192,996 |
| | | | | | | | | |
| **Total expenses** | **1,074,381** | **1,098,528** | **1,123,399** | **1,149,017** | **1,175,403** | **1,202,581** | **1,230,575** | **1,259,407** |
| | | | | | | | | |
| **Net Income** | **661,314** | **681,672** | **716,141** | **764,698** | **883,437** | **933,659** | **998,545** | **1,062,593** |

EXHIBIT "F"

<u>COMMERCIAL LEASE</u>

THIS LEASE made this ___ day of January, 2010 by and between Hidden Lake Academy, Inc., a Georgia Corporation, as Debtor and Debtor In Possession in that certain bankruptcy case filed under Title 11 USC chapter 11 pending in the United States Bankruptcy Court, Northern District of Georgia, Gainesville Division, case no. 09-22028 (hereinafter referred to as "Landlord") and Ridge Creek, Inc., a Georgia Corporation (hereinafter referred to as "Tenant").

**WITNESSETH**:

## 1.  <u>PREMISES</u>

Landlord does hereby demise, rent and lease to tenant and Tenant from Landlord the following described property (hereinafter referred to as "Premises"): All land and buildings owned by Landlord and located in Dahlonega, Lumpkin County, Georgia.  The land and its location is more particularly shown by the legal descriptions attached and incorporated herein as Exhibits "A" and "B".

## 2.  <u>TERM</u>

To have and to hold the same for a term (the "Lease Term") beginning on the fifteenth (15th) day of January, 2010 (the "Commencement Date"), and ending at Midnight on the thirty-first (31st) day of December 2015, unless sooner terminated or extended by the parties.

## 3.  <u>RENTAL</u>

Tenant shall pay to Landlord partial rent of $20,000.00 on January 15, 2010, February 15, 2010 and March 15, 2010 and thereafter shall pay Base Rent of $66,551.00 each and every month thereafter during the Lease Term in advance on the first (1st) day of each month beginning on April 1, 2010.  In addition, Tenant shall pay to Landlord all hazard and liability insurance premiums and all ad valorem real and personal property taxes for the Premises.  Said insurance premiums and ad valorem real and personal property taxes for the Premises shall be paid to Landlord by Tenant upon landlord incurring an obligation to pay such premiums and taxes. Amounts incurred for insurance premiums and ad valorem taxes shall be prorated if said premium and tax bills reflect periods of time during which Tenant has not leased the Premises so that Tenant shall only be responsible for those portions of insurance premiums and ad valorem taxes representing amount incurred for Tenant's lease term. In addition to Base Rent, hazard and liability insurance premiums and ad valorem real and personal property taxes, Tenant shall also pay to Landlord during the term of this Lease "Percentage Rent" on the first (1st) of each month beginning with May 1, 2010 and continuing on the first (1st) day of each and every month through the month after termination of the Lease according to the following schedule:

(a)    Three percent (3%) of the gross revenues for gross revenue between $414,660.00 and $600,000.00 of gross revenue for the preceding month; and

(b)    One percent (1%) of the gross revenues in excess of $600,000.00 for the preceding month.

"Gross Revenue" of Tenant for purposes of this Lease shall include all amounts of revenue received by Tenant in its operations on or related to the Premises, including but not limited to, all tuition, fees, or other revenue amounts received by Tenant, less any tuition refunds, but specifically not including any charitable contributions to any charitable funds, if any, maintained by Tenant under applicable Internal Revenue Code and Regulation provisions.

Together with the payment of Percentage Rent, Tenant shall deliver to Landlord a statement of all gross revenues received by Tenant during the preceding month.  Landlord upon written notice to Tenant shall have the right to audit the books and records of Tenant at anytime and from time to time to determine the method and accuracy of Tenant's reporting of gross revenue.  Should said reporting indicate that gross revenues have been under-reported by greater than one percent (1%), then Tenant shall pay the additional rent due to Landlord plus interest at the rate of one point five percent (1.5%) per month from the date the rent should have been paid had the gross revenues been reported accurately, plus reimburse Landlord for the entire expense of the audit.

## 4.  USE

(a)    The Premises shall be used for school purposes only and no other, said school shall operate and have students present three hundred sixty-five (365) days per year each and every year during the term of this Lease.  The Premises shall not be used for any illegal purposes; nor in violation off any regulation of any governmental body; nor in any manner to create any nuisance or trespass.  Tenant shall at its own expense obtain any and all licenses and permits necessary for its use of the Premises.  Tenant shall not receive, store or otherwise handle any product, material, or merchandise which is explosive or highly inflammable or which is considered a "Hazardous Substance" as hereinafter defined.  "Hazardous Substance" means pollutants, contaminants, toxic or hazardous substances or wastes, oil or petroleum products, flammables or any other substances whose nature and/or quantity of existence, use, release, manufacturer effect renders it subject to clean up under any Federal, State or local environmental, health, community awareness or safety laws or regulations, now or hereafter enacted or promulgated by any governmental authority or court ruling, or any investigation, remediation or removal.  In no event shall any activity carried out on the Premises emit smoke, noxious odor, dust, or excessive noise that would affect the neighboring buildings.  Tenant will comply with the local fire department rules and regulations.

(b)  Landlord may inspect the Premises during business hours to determine whether or not Tenant is complying with the terms and provisions of this Lease or to show the Premises to

prospective purchasers or mortgagees of the Premises and during the last one (1) year of the term of this Lease to prospective Tenants.

## 5.  REPAIRS

(a)    Landlord shall, at its expense, maintain the roofs, foundation, structural part, outside walls, and the concrete floors of the leased buildings to the extent damage thereto is due to settling, structural faults or results otherwise from causes not arising and not due to the acts of failure to act of Tenant, Tenant's assigns, Tenant's employees, students, customers, or invitees.  The term "walls" as used herein shall not include glass or plate glass.  Landlord gives Tenant exclusive control of the Premises and shall be under no obligation to inspect the Premises.  Tenant shall immediately give Landlord written notice of any defective condition which Landlord is required to repair, after which Landlord shall have reasonable opportunity to repair same or cure such defect. Landlord shall have the right, but not the duty, to enter the Premises at any time in order to examine the Premises or any building. Nothing contained in this Lease shall require Landlord to repair any damage caused by Tenant, and Tenant shall cause said repairs to be made at its expense.

(b)    Tenant accepts the Premises in their present condition as suited for the use intended by Tenant. Tenant shall keep and maintain the Premises in good order and good repair and first class cosmetic condition, including all grounds and structures, and shall promptly make all repairs except those foregoing, Tenant shall be responsible for all maintenance and repair of all decorating, grounds, equipment and fixtures used in connection with the Premises, including landscaping, heating, ventilation, air conditioning, plumbing, electric, gas, and telephone equipment and fixtures. Tenant shall on the end of the term hereof return the keys and deliver possession of the Premises by the installation, removal and/or use of said fixtures, equipment or machines. Tenant shall not remove fixtures, equipment or machines from Premises if it is in default under this Lease.

(c)    Tenant shall keep the grounds, parking areas, driveways and alleys and the whole of the Premises in a clean and sanitary condition free of any trash, scraps or any materials and products pertaining to its business. No area outside of the buildings shall be used by Tenant for storage without Landlord's prior written permission. Tenant shall care for the grounds surrounding the buildings, including the mowing of grass, care of shrubs, and general landscaping.

## 6. ALTERATION, ADDITIONS, IMPROVEMENTS

(a)    No buildings, alternation, additions or improvements in the Premises shall be made without the prior written consent of Landlord.  Any building, alterations, additions or improvements constructed by Tenant after consent of Landlord must comply with all applicable zoning and building codes. Landlord may, but is not required, to approve additional buildings, alterations, additions or improvements.

(b)    At the termination of this lease, Tenant shall, if Landlord elects, remove all buildings, alterations, additions or improvements erected by Tenant and restore the Premises to

their original condition, unless Landlord previously approved such buildings, alterations, additions or improvements and waived the right in writing to such restoration. All such removals and restoration shall be accomplished in a good workmanlike manner. Tenant shall keep Premises free of any mechanic's lien or encumbrances due to Tenant's construction of buildings, alterations, additions, removal or improvements. If the Landlord does so elect, all buildings, alterations, additions or improvements made in or upon the Premises, either by the Tenant or the Landlord, shall be the Landlord's property, and shall remain upon the Premises at the termination of this Lease by lapse of time or otherwise, without compensation to the Tenant.

## 7. DESTRUCTION OR DAMAGE

(a)     If either the Premises are totally destroyed or so substantially damaged as to be untenantable by fire, lightning, earthquake, windstorm, or other casualty, and cannot be repaired within a reasonable time, this lease may be terminated by either party upon thirty (30) days written notice to the other, and rent shall be accounted for between Landlord and Tenant as of the termination date.

(b)     If the Premises, or any part thereof, are damaged but not rendered untenantable by any above mentioned casualty, Landlord shall repair the Premises within a reasonable time after receipt of written notice thereof; provided, that Landlord shall not be required to rebuild, repair or replace any part of the buildings, alterations, additions, improvements, equipment or machinery which may have been placed on the Premises by Tenant. Until such repairs shall be made, the rent shall be abated proportionately to the part of the Premises which is usable by Tenant. At the completion of such repairs, full rent shall recommence.

(c)     Any insurance which may be carried by Landlord or Tenant against loss or damage to the building and/or the Premises shall be for the sole benefit of the party carrying such insurance.

(d)     Tenant shall not make any use of the Premises which would make void or voidable any policy of fire or extended coverage insurance insuring the Premises, and if by reason of any use by Tenant of the Premises, the hazard premiums on policies maintained by Landlord shall be increased over normal rates for this type of building, the amount of the increase in the premium shall be paid by Tenant to Landlord in accordance with paragraph 3 hereof.

## 8. LIABILITY AND INDEMNIFICATION

(a)     Tenant does hereby agree to indemnify and save Landlord harmless from and against any and all liability for any injury to or death of any person or persons or damage to property in any way arising out of or connected with the condition, use or occupancy of the Premises, or in any way arising out of the activities of Tenant, its agents, employees, licensees or invitees on the Premises and/or the building and from all costs, expenses and liabilities, including but not limited to reasonable attorneys fees, incurred by Landlord in connection therewith, excepting, however, liability caused by Landlord's negligence.

(b)        Tenant covenants and agrees that Landlord shall not be liable to Tenant for any injury or death to any person or persons or for damage to any property of Tenant, or any person claiming through Tenant, arising out of any accident or occurrence in the Premises, including, without 'limiting the generality of the foregoing, injury, death or damage caused by the Premises or of any portions of the Premises being out of repair, or caused by any defect in or failure of equipment, pipes, or wiring, or caused by broken glass, or caused by the backing up of drains, or caused by gas, water, steam, electricity, or oil leaking, escaping or flowing into Premises, or caused by fire or smoke, or caused by the acts or omissions of other tenants located in or about the building other than any and all acts caused by Landlord's negligence, and landlord's agents, employees, licensees or invitees.

(c)        At all times during the term of this Lease, Tenant shall keep in effect with insurance companies, satisfactory to Landlord, legally authorized to transact business in Georgia and maintaining an office or agency in the State of Georgia, public liability insurance including personal injury in the name of and for the benefit of Landlord and Tenant, with limits for bodily injury or death of not less than $1,000,000 for each person; $1,000,000 for each occurrence; and for property damage not less than $100,000. All policies and certificates of insurance shall name Landlord as an additional insured and shall provide that all Landlord's losses, to the limit of the policy, will be indemnified and all liability claims against Landlord" resulting from Tenant's business will be defended by Tenant or his insurance carrier at no cost to Landlord. Tenant shall promptly deliver to Landlord all such certificates of insurance, and they shall be held by Landlord. Tenant agrees that it shall not cancel any of the above mentioned policies, or allow any one to lapse without delivering to Landlord a certificate indicating equal or greater coverage written by an insurance company acceptable to Landlord. The loss limits of insurance required to be maintained by Tenant may be periodically increased by Landlord in Landlord's sole discretion and to reflect industry standards.

(d)        Notwithstanding any other provision of this lease, each party hereto hereby waives any cause of action it may have against the other party hereto on account of any loss or damage which is covered by any insurance policy of which the damaged party is a beneficiary. Each party agrees that it will request its insurance carrier to endorse all applicable policies, waiving the carrier's right of recovery under subrogation or otherwise which said carrier would have in the absence of this Section.

(e)        Landlord does hereby agree to indemnify and save Tenant harmless from and against any and all liability for any injury to or death of any person or persons or damage to property in any way arising out of the activities of Landlord, its agents, employees, licensees or invitees on the Premises and/or the buildings and from all costs, expenses and liabilities, including but not limited to reasonable attorneys fees, incurred by Tenant in connection therewith, excepting, however, liability caused by Tenant's negligence.

## 9. DEFAULTS AND REMEDIES

(a)    If Tenant fails to keep or perform any covenant or provision of this lease (except payment of any installment of rent or other charge or money obligation herein required to be paid by Tenant) or violates any such covenant or provision, Landlord may, in addition to all other remedies at law or in equity or elsewhere provided for in this lease, without notice, enjoin Tenant from any such failure or violation.

(b)    Any installment of rent or any other charge or money obligation herein required to be paid by Tenant which is not paid within ten (10) days of when due shall bear interest at the rate of two percent (2 %) per annum above the prime interest rate then declared or the highest lawful rate, whichever is less, from the due date until paid, and any such charge of money obligation shall be additional rent hereunder.

(c)    The occurrence of any of the following is deemed to be an "Event of Default" under this lease:

(1)    The making by Tenant of an assignment for the benefit of its creditors;

(2)    The levying of a writ of execution or attachment on or against the property of Tenant and the same not being released or discharged within thirty (30) days thereafter;

(3)    The institution of proceedings for the reorganization, liquidation or involuntary dissolution of Tenant, or for its adjudication as a bankrupt or an insolvent, or for the appointment of a receiver of the property of Tenant, and said proceeding not being dismissed, and any receiver, trustee or liquidator appointed therein not discharged within thirty (30) days after the institution of such proceedings;

(4)    The doing or permitting to be done of any act by Tenant which creates a claim or a lien therefor against the Premises and/or building and the same not being released or otherwise provided for by indemnification satisfactory to Landlord within thirty (30) days thereafter;

(5)    Failure of Tenant to pay any installment of rent or other charge or money obligation herein required to be paid by Tenant within ten (10) days after written notice or within thirty (30) days after the due date (without any requirement of notice or demand), or to comply with any other covenant or provision of this lease within thirty (30) days after written notice of such failure is given by Landlord, or if it is not possible to cure such failure within such period promptly after receipt of such notice, to advise Landlord in writing of Tenant's intention duly to institute all steps necessary to cure such failure or violation and to begin performance of such covenant within such period and diligently to pursue performance to completion in a reasonable time thereafter; or

(6)    The abandonment or desertion of all or substantially all of the Premises by Tenant.

(d)      In the event of an Event of Default, Landlord has the option of pursuing anyone or more of the following remedies without any notice or demand whatsoever:

(1)      Terminate this Lease, in which event Tenant shall immediately surrender Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have, enter upon and take possession of Premises and expel or remove Tenant and any other person who may be occupying Premises or any part thereof, by force, if necessary, without being liable for prosecution or any claim of damages therefor;

(2)      Enter upon and take possession of Premises and expel or remove Tenant and any other person who may be occupying Premises or any part thereof, without being liable for prosecution or any claim of damages therefore, and, if Landlord so elects, make such alterations and repairs as may be necessary to relet Premises, or any part thereof at such rent and for such period of time and subject to such terms and conditions as Landlord may deem advisable and receive the rent therefor. Upon each such reletting all rent received by the Landlord from such reletting shall be applied first to the payment of any expenses of such reletting, including brokerage fees and attorneys fees and costs of such alterations and repairs; and second to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; third to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

(3)      Landlord may, in addition to any other remedies at law or in equity or elsewhere in this lease provided, cure or prosecute the curing of such failure or violation at reasonable expenses, which expenses shall be paid to Landlord by Tenant on demand. Tenant agrees that in the event of any failure or violation covered by this Article, all rights of Landlord may be exercised by persons acting on behalf of Landlord, under authority granted by Landlord, with full right of reimbursement as provided hereunder. Tenant agrees that neither Landlord nor any such person acting on its behalf shall be liable for any damage resulting to the Tenant by the exercise of the rights granted under this Article.

(e)  Should Landlord terminate this Lease in accordance with the provisions of this Article, Landlord may in addition to any other remedies it may have, immediately recover from Tenant all damages Landlord may incur by reason of such breach, including the cost of recovering Premises and reasonable attorneys fees, and including the worth, at the time of such termination, of the excess, if any, of the amount of rent and charges equivalent to rent reserved in thisLlease for the remainder of the Lease Term over the then reasonable rental value of Premises for the remainder of the Lease Term.

(f)  Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or of any damages accruing to Landlord by reason of the violation of any of the covenants and provisions herein contained.

(g) Tenant hereby appoints as its agent to receive service of all dispossessory or distress proceedings and notices there under the person in charge of Premises at the time, and if no person is then in charge of Premises, then such service or notice may be made by attaching the same to the entrance of Premises, provided that a copy of any such proceedings or notices shall be mailed to Tenant at the Premises.

## 10. <u>CONDEMNATION</u>

If during the term of this Lease the Premises or any substantial part thereof be condemned or taken by any governmental authority or any corporation having the power of eminent domain, the court in such condemnation proceedings shall be requested to make separate awards to Landlord and Tenant, and Landlord and Tenant agree to request such action by such court; however, in the event that the court grants only one award then it shall be the sole and exclusive property of the Landlord, and Tenant shall make no claim against this award. If an award is made or payments are available for relocation expenses of Tenant, then this award shall be the sole and exclusive property of Tenant, and Landlord shall make no claim to such and shall immediately pay such to Tenant if received by Landlord. If the entire Premises are condemned, or if the portions of the Premises remaining after such condemnation proceedings shall not be suitable for Tenant's use, this Lease shall terminate as of the date of taking. If the portion of the Premises remaining after such condemnation proceedings shall be suitable for Tenant's use, the rent payable by Tenant to Landlord after taking shall be reduced to the proportion of the rent stipulated hereunder which the square footage of the Premises remaining after the taking bears to the square footage of the Premises immediately prior to the taking.

## 11. <u>SUBORDINATION</u>

(a)      This Lease and all rights of Tenant hereunder are and shall be subject and subordinate to the lien of any mortgage, deed to secure debt, deed of trust or other instrument in the nature thereof which may now or hereafter effect Landlord's or his successors interest in the fee title to the Premises. Landlord agrees to use its best efforts to obtain an agreement from any future lenders to allow the attornment of Tenant to such Lender should such lender become the Landlord, so long as Tenant is not in default under the terms hereof. In confirmation of such subordination, Tenant shall, upon demand, at any time or times execute, acknowledge and deliver to Landlord, without expense to Landlord, any and all instruments that may be requested by Landlord to evidence the subordination of this Lease and all rights hereunder to the lien of any such mortgage, deed to secure debt, deed of trust or other instrument in the nature thereof, and each renewal, modification, consolidation, replacement, or extension thereof, and, if Tenant shall fail at any time to execute, acknowledge, and deliver any such instrument, Landlord, in addition to any other remedies available to it in consequence thereof, may execute, acknowledge and deliver the same as the attorney in fact of Tenant and in Tenant's name, place and stead, and Tenant hereby irrevocably makes, constitutes and appoints Landlord, its successors and assigns, such attorney in fact for that purpose.

(b)      If the holder of any mortgage, deed to secure debt, deed of trust, or other instrument in the nature thereof shall hereafter succeed to the rights of Landlord under this lease, whether through possession or foreclosure action or delivery of a new lease, at the option of such holder, Tenant shall attorn to and recognize such successor as Tenant's Landlord under this lease, and shall

promptly execute and deliver any instrument that may be necessary to evidence such attornment, and Tenant hereby irrevocably appoints Landlord the attorney in fact of Tenant to execute and deliver such instrument on behalf of Tenant should Tenant refuse or fail to do so within ten (10) days after Landlord shall give notice to Tenant requesting the execution and delivery of such instrument, which notice shall be accompanied by a draft of such instrument. Upon any such attornment, this lease shall continue in full force and effect as a direct lease between such successor Landlord and Tenant, subject to all of the terms, covenants and conditions of this lease.

(c)      Tenant shall have no authority, express or implied, to create or place any lien or .. encumbrance, of any kind or nature whatsoever, upon, or in any manner to bind, the interest of Landlord in the Premises or to charge the rental payable hereunder or any claim in favor of any person dealing with Landlord. The Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises for which any lien is or can be validly and legally asserted, and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the rights, title and interest of the Landlord in the Premises or under the terms of this Lease. Tenant further agrees to bond or pay every lien within thirty (30) days of the date said lien attaches to the Premises and/or Landlord's property.

## 12. SERVICES

Tenant agrees to pay all charges, fees and deposits incurred for any utility services used on the Premises. Tenant shall pay all water, sewage, trash removal, gas, and electrical utility charges. Landlord shall in no event be liable for any interruption or failure of utility services on the Premises, but if requested by Tenant, shall make reasonable effort to secure speedy resumption of said interrupted service. Tenant shall promptly notify the proper public authorities and utility companies to provide for water, sewer, trash removal, gas and electricity service in Tenant's name and all costs for such services shall be borne by Tenant.

## 13. PERSONALTY OF TENANT

(a)      If the Tenant shall not remove all goods, wares, equipment, fixtures, furniture, inventory, accounts, contract rights, chattel paper and other personal property situated on the Premises at the termination of this Lease, Landlord may, at its option, remove all or part of said property in any manner that Landlord shall choose and store the same without liability for loss thereof, and Tenant shall be liable to Landlord for all expenses incurred in such removal and storage of said property.

(b)      Upon the termination of this Lease wherein Tenant shall be indebted in any amount to Landlord, in addition to the statutory lien for rent in Landlord's favor, Landlord shall have and Tenant hereby grants to Landlord a continuing security interest for all rentals and any other sums becoming due hereunder from Tenant upon all property described in the preceding subparagraph. Such property shall not be removed from the Premises without the consent of Landlord until all arrearage in rent, as well as any and all other sums of money then due to Landlord hereunder, shall first have been paid and discharged.

## 14. SUBLETTIING AND ASSIGNMENTS

(a)    Tenant may not, without the prior written consent of Landlord, directly or indirectly assign, transfer or hypothecate this Lease, nor any interest hereunder, nor sublet the Premises, nor any part thereof nor permit the use of the Premises by any party other than Tenant. Any merger of Tenant with another entity shall be considered an indirect assignment of this Lease. Notwithstanding any permitted assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the rent and other herein specified charges and for compliance with all of Tenant's other obligations under the terms, provisions and covenants of this lease. Any such assignment or subletting shall be limited to the existing term of the lease. Landlord shall have the right, in its discretion, to substitute any such assignee or subtenant for the Tenant and release Tenant from any further obligations under this Lease, in which event Tenant shall have no further rights or obligations under the Lease.

(b)    In the event that Landlord consents to an assignment or sublease of the Premises, the Tenant is not released from the Tenant's obligations under the Lease, and the assignee or subtenant pays a rent in excess of the rent owed by the Tenant under this Lease, then the Landlord shall be entitled to one-half (50%) of the excess.

(c)    Upon the occurrence of any default or Event of Default by Tenant as herein denied, if the Premises or any part thereof are then assigned or sublet, Landlord, in addition to any other remedies herein provided or provided by law, may at its option collect directly from such assignee or subtenant all rents becoming due to Tenant under such assignment or sublease and apply such rent against any sum due to Landlord by Tenant hereunder, and such collection shall not be construed to constitute a novation nor a release of Tenant from the further performance of its obligations hereunder.

## 15. MISCELLANEOUS

(a)    In the event Landlord is required by Landlord's lender or prospective lender to furnish financial statements on tenants of the Premises, upon Landlord's request, Tenant shall furnish to such lender its most current available financial statement, provided that except as provided in Article 3 hereof,  Tenant shall not be required to furnish more than one such statement in any calendar year. Tenant is not required to furnish the financial statement to the Landlord, only to the Lender. Tenant may prohibit Lender from furnishing Landlord with a copy of the financial statement.

(b)    The words "terminate" or "termination" as used herein shall refer to the end of this Lease whether due to the expiration of the term hereof or the earlier ending of this lease in accordance with the terms and provisions hereof.

(c)    All rights, powers and privileges conferred herein upon the parities hereto shall be cumulative but not restrictive of those given by law.

(d)    The captions used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof.

(e)      One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

(f)      At any time and from time to time, Tenant, on or before the date specified in the request made by Landlord, which date shall not be earlier than five (5) days from the making of such request, shall execute, acknowledge and deliver at no cost to Landlord a certificate evidencing whether or not: (a) this Lease in full force and effect; (b) this Lease has been amended in any way and if so, how; (c) there are any existing defaults hereunder to the knowledge of Tenant and specifying the nature of such defaults, if any; and (d) the date to which rent, if any, has been paid. Each certificate delivered pursuant to this paragraph may be relied on by any prospective purchaser or transferee of Landlord's interest hereunder and shall stop Tenant from denying the facts stated in said statement. Each such certificate provided for herein shall be prepared by Landlord or its agent and furnished to Tenant.

(g)      This Lease contains the entire agreement of the parties and no representations or agreements, oral or otherwise, between the parties not embodied herein, shall be of any force or effect.

(h)      Time is of the essence of this agreement.

(i)      The rules and regulations attached to this instrument and any amendments and additions thereto as may be reasonably made by Landlord from time to time shall be and are hereby made a part of this Lease. Tenant, its employees and agents, will perform and abide by said rules and regulations, and any amendments or additions to said rules and regulations.

(j)      This contract shall create the relationship of landlord and tenant between Landlord and Tenant; no estate shall pass out of Landlord; Tenant has only a usufruct, not subject to levy and sale.

(k)      If Tenant remains in possession after expiration of the term hereof, with Landlord's acquiescence and without any agreement of parties, Tenant shall be a tenant at will; and there shall be no renewal of this lease by operation of law. During any such holding over, the monthly rate of Rent due and payable hereunder shall be increased to 150% of the monthly rate of Rent which was last applicable hereunder prior to the holding over.

(l)      The term "Landlord" as used in this lease means only the owner of the Premises so that in the event of any sale or sales or foreclosure thereof, Landlord, who is grantor in any such sale or foreclosure, shall be and is hereby entirely relieved of all of the obligations of Landlord hereunder. Any and all references to Landlord shall equally apply to his successors in interest.

(m)    All notices required to be given to Landlord hereunder shall, until contrary instructions are given to Tenant in writing, be effectively given to Landlord if mailed, by registered or certified mail, return receipt requested, to the following address:

> Leonard Buccellato, President
> Hidden Lake Academy, Inc.
> Suite 1146
> 3390 Peachtree Road, N.E.
> Atlanta, Georgia 30326

All notices required to be given to Tenant hereunder shall, until contrary instructions are given to Landlord in writing, be effectively given to Tenant if mailed, by registered or certified mail, return receipt requested, to Tenant to the following address:

> _____
> _____
> _____
> _____

(n)    If any clause or provision of this Lease is or becomes illegal, invalid or unenforceable because of present or future laws, rules or regulations of any governmental body, or becomes unenforceable for any reason, the intention of the parties hereto is that the remaining parts of this lease shall not be thereby affected.

(0)    Landlord will provide Tenant with a designed location on the front of the premises above the front entrance for Tenant to place an identification sign. Such sign must conform with Landlord's rules and regulations concerning the size and design of signs, and shall be the only sign to be placed by Tenant on the front of the premises.

## 16. SUBORDINATION AND ATTORNMENT

(a)    Tenant agrees that this Lease and all rights of Tenant hereunder are and shall be subject and subordinate to any ground or underlying Lease which may now or hereafter be in effect regarding the Premises or any, component thereof, to any mortgage now or hereafter encumbering the Premises or any component thereof, to all advances made or hereafter to be made upon the security of such mortgage, to all amendments, modifications, renewals, consolidations, extensions and restatements of such mortgage, and to any replacements and substitutions for such mortgage. The terms of this provision shall be self operative and no further instrument of subordination shall be required. Tenant, however, upon request of any party in interest, shall execute promptly such instrument or certificates as may be reasonably required to carry out the intent hereof, whether said requirement is that of Landlord or any other party in interest, including, without limitation, any mortgagee. Landlord is hereby irrevocably vested with full power and authority as attorney-in-fact for Tenant and in Tenant's name, place and stead, to subordinate Tenant's interest under this Lease to the lien or security title of any mortgage and to any future instrument amending, modifying, renewing, consolidating, extending, restating, replacing or substituting any such mortgage.

(b)      If any mortgagee or lessee under a ground or underlying lease elects to have this Lease superior to its mortgage or Lease and signifies its election in the instrument creating its lien or Lease or by separate recorded instrument, then this Lease shall be superior to such mortgage or Lease, as the case may be. The term "mortgage", as used in this Lease, includes any deed to secure debt, deed of trust or security deed and any other instrument creating a lien in connection with any other method of financing or refinancing. The term "mortgagee", as used in this Lease, refers to the holder(s) of the indebtedness secured by a mortgage.

(c)      In the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under, any mortgage covering the Premises, or in the event the interests of Landlord under this Lease shall be transferred by reason of deed in lieu of foreclosure or other legal proceedings, or in the event of termination of any lease under which Landlord may hold title, Tenant shall, at the option of the transferee or purchaser at foreclosure or under power of sale, or the lessor of the Landlord upon such lease termination, as the case may be (sometimes hereinafter called "such person"), cancel this Lease and vacate the premises or attorn to such person and shall recognize and be bound and obligated hereunder to such person as the Landlord under this Lease; provided, however, that no such person shall be (i) bound by any payment of Rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by Tenant of its obligations under this Lease (and then only if such prepayments have been deposited with and are under the control of such person); (ii) bound by any amendment or modification of this Lease made without the express written consent of the mortgagee or lessor of the Landlord, as the case may be; (iii) obligated to cure any defaults under this Lease of any prior landlord (including Landlord); (iv) liable for any act or omission of any prior landlord (including Landlord); (v) subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord); or (vi) bound by any warranty or representation of any prior landlord (including Landlord) relating to work performed by any prior landlord (including Landlord) under this Lease. Tenant agrees to execute any Attornment Agreement not in conflict herewith requested by Landlord, the mortgagee or such person. Tenant's obligation to attorn to such person shall survive the exercise of any such power of sale, foreclosure or other proceeding. Tenant agrees that the institution of any suit, action or other proceeding by any mortgagee to realize on Landlord's interest in the Premises pursuant to the powers granted to a mortgagee under its mortgage, shall not, by operation of law or otherwise, result in the cancellation or termination of the obligations of Tenant hereunder. Landlord and Tenant agree that notwithstanding that this Lease is expressly subject and subordinate to any mortgages, any mortgagee, its successors and assigns, or other holder of a mortgage or of a note secured thereby, may sell the Premises in the manner provided in the mortgage and may, at the option of such mortgagee, its successors and assigns, or other holder of the mortgage or note secured thereby, make such sale of the Premises subject to this Lease.

## 17. SPECIAL STIPULATIONS

Insofar as the following special stipulations conflict with any of the foregoing provisions, the following shall control:

N/A

IN WITNESS WHEREOF, the parties herein have hereunto set their hands and seals, in triplicate, the day and year first above written.

"LANDLORD"                                   "TENANT"

Hidden Lake Academy, Inc.                 Ridge Creek, Inc.,
a Georgia Corporation                     a Georgia Corporation

By: /s/ Leonard Buccellato          By: /s/ _____
Leonard Buccellato, President                                   [Title]
                    [Seal]                                       [Seal]

<u>RULES AND REGULATIONS</u>

(1)    Tenant shall not permit their employees, students, customers or visitors to regularly park during business hours on public streets near the premises, if any, and Tenant shall require that their customers, employees, students, and visitors shall obey the ordinances, resolutions, rules and regulations of the County.

(2)    Any outdoor storage facility or trash containers shall be effectively screened from all street frontage and shall be kept in a neat and clean condition. All trash shall be kept therein.

(3)    All outdoor signs or advertising material in or upon the exterior walls of the premises or buildings, interior or exterior windows or grounds of the building in which the premises are located shall be first approved by Landlord. There shall be no signs attached to the roofs.

(4)    Other than at employee residences, Tenant shall not permit its employees, visitors; customers, owners or principals to store any vehicles or other items to remain in the parking area and approach area for longer than one working day. Notwithstanding anything herein to the contrary, Tenant may maintain company vehicles in the parking area overnight, as long as the vehicles are in good operating condition.

**EXHIBIT "A"**

All that tract or parcel of land lying and being in Land Lots 943, 944, 945, 946, 1001, 1002, and 1016 of the 1th District, 1st Section of Lumpkin County, Georgia and containing 190.83 acres according to a plat for Hidden Lake Academy by Michael L Scupin & Associates recorded in plat book 27, page 76, Lumpkin County, Georgia Records, said plat being incorporated herein by reference; and

All that tract or parcel of land lying and being in Land Lot 944, 11st District, 1st Section, Lumpkin County, Georgia, embracing 5.259 acres, and being more particularly described as follows:

To find the true point of beginning, commence at the north\vest corner of Land Lot 944, aforesaid District and Section~ running thence South 83-17-39-East 606.67 feet to a U.S.F.S. Marker found; thence South 84-10-53 East 330.33 feet to an IPS and the True Point Of Beginning; thence South 84-10-53 East 184.03 feet to a square pipe found (said pipe also being North 84-09-25 \Vest 334.97 feet from a U.S.F.S. Marker found); thence South 21-30-07 West 121.26 feet to a rebar found; thence South 09-21-00 West 165.57 feet to a rebar found; thence South 24-55-17 West 130.51 feet to a rebar found; thence South 28-34-19 West 80.69 feet; thence South 11-12-05 East 34.82 feet; thence South 03-41-59 East 41.2 7 feet~ South 43-54-51 West 62.23 feet; thence South 62-33-35 West 51.50 feet; thence South 73-46-11 West 56.12 feet;" thence South 46-46-27 West 59.14 feet; thence South 58-02-27 West 75.33 feet; thence South 29-47-26 West 103.19 feet; thence South 37-58-55 West 46.05 feet; thence South 53-18-48 West 62.53 feet; thence South 46-05-45 West 57.62 feet; thence South 27-59-46 West 70.83 feet to a point on the northwest right-of-way of Hidden Lake Road (a 40-foot right-of-way); thence along said right-of-way, South 72-29-49 West 137.05 feet to an IPS; thence North 21-15-28 East 277.19 feet to an IPS: thence North 34-32-59 East 477.87 feet to an IPS; thence North 21-41-56 East 352.96 feet to an IPS; thence North 40-46-44 East 99.04 feet to the True Point Of Beginning, as shown on plat of survey for Nancy M. Mahone, by Michael Stewart Kelley, Ga.
R.L.S. No. 2313, dated August 16,1995, which plat is incorporated herein by reference and made a part hereof.

Subject To and Together with all easements, agreements, restrictions, and rights-of-way of record in Lumpkin County, Georgia and further subject to the following restrictions, which shall be construed as covenants running with the land:

1.   Subdivision of the above-tract shall be permitted; however, in no instance shall said tract be subdivided into greater than three (3) separate parcels by Purchaser.
2.   No chickens, pigs or cows.
3.   Minimum square footage shall be 1000 square feet.
4.   No mobile homes or double-wide mobile homes, except modular homes with shingled roof and underpinning.

EXHIBIT "G"

MANAGEMENT AND MARKETING AGREEMENT

The Agreement is being entered into by and between Ridge Creek, Inc.. a Georgia Corporation ( hereinafter referred to as "RCI") and Hidden Lake Academy, Inc., a Georgia Corporation (hereinafter referred to as "Hidden Lake").

**WHEREAS**, Hidden Lake formally  provided management and marketing services to several affiliate corporate entities, including RCI;

**WHEREAS** only RCI is currently operating a school and is renting that certain real property owned by Hidden Lake located in Lumpkin County, Georgia (the "Property");

**WHEREAS** Hidden Lake no longer provides management or marketing services to RCI;

**WHEREAS** Hidden Lake still provides certain leased computer and telephone equipment for the use and benefit of RCI;

**WHEREAS** Hidden Lake provides insurance for RCI's benefit and pays the ad valorem property taxes on the Property;

**WHEREAS**, Hidden Lake filed a petition constituting an order for relief pursuant to Tile 11 chapter 11 on May 14, 2009 in the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division, case no 09-22028;

**WHEREAS**, RCI will provide various school and rehabilitation programs for young adults on the Property; and

NOW THEREFORE, for Ten Dollars (S10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned agree as follows:

1.

Hidden Lake shall provide for RCI's use certain computer and telephone equipment and RCI shall pay the cost to Hidden Lake for the continued provision of said equipment.  Hidden Lake shall also provide casualty loss insurance on the Property and shall pay the ad valorem real property taxes on the Property.

2.

Services to be provided by Hidden Lake shall begin on January 15 2010 and continue from year to year through end of the Lease term as such may be extended under the commercial lease agreement between the parties hereto, a copy of which is attached and incorporated herein as Exhibit "A".

3.

RCI shall reimburse Hidden Lake $98,796 per year for the use of Hidden Lakes leased equipment. The yearly amount to be paid to Hidden Lake under the terms this Agreement shall

be paid in 12 monthly increments beginning January 15, 2010 and thereafter on the 1st day of each and every month.

5.

The Parties shall at any and all times upon the request by the other Party, or his or her legal representatives, make, execute, and/or deliver any and all such other and further instruments or records as may be necessary or desirable for the purpose of giving full force and effect to the provisions of this Agreement in accordance with the laws of the State of Georgia, without charge therefor, within thirty (30) days of such request.

6.

This Agreement may not be altered, changed or modified except in writing signed by each of the Parties.

7.

No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach of this Agreement.

8.

If any provision of this Agreement should be held invalid, illegal or unenforceable by a Court of competent jurisdiction, all of the other provisions of this Agreement shall remain in full force and effect as if such invalid, illegal or unenforceable provision had never been contained herein.

9.

Time is of the essence in this Agreement.

10.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original copy, and may be enforced as such.

This Agreement shall be enforced and interpreted under the laws of the State of Georgia and shall be effective on the 15th day of January, 2010.

Hidden Lake Academy, Inc.                          RCI, Inc.
A Georgia Corporation                              A Georgia Corporation


By: /s/ Leonard Buccellato                         By: /s/ _____
      Leonard, Buccellato, President                                        [Title]

EXHIBIT "H"

## TERMINATION AGREEMENT

This **Termination Agreement** (this "Agreement") is made and entered into as of this _____ day of January, 2010, by and between HIDDEN LAKE ACADEMY, INC., a Georgia corporation ("Hidden Lake") and HLA, Inc., a Georgia non-profit corporation ("HLA").

### WITNESSETH:

**WHEREAS,** Hidden Lake and HLA entered into that certain Management and Marketing Agreement dated January 1, 1998 (the "Agreement") which provided for the provision of certain management and marketing services for the operation of Hidden Lake Academy school;

**WHEREAS,** the Agreement provides for a term through the end of the term of that certain Commercial Lease Agreement dated January 1, 1998, and extended by that certain Extension of Commercial Lease agreement dated December 31, 2007 (the "Lease"), by and between Hidden Lake and HLA;

**WHEREAS,** the parties have entered into a Termination Agreement effective January 15 2010 terminating the Lease (the "Lease Termination Agreement");

**WHEREAS,** on May 14, 2009, both Lessor and Lessee filed voluntary petitions for relief under Title 11 chapter 11 in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), which remain pending under case numbers 09-22028 and 09-22026, respectively.

**WHEREAS,** the termination of the Lease will not be effective until the earlier to occur of (i) the dismissal of Lessee's chapter 11 case, or (ii) entry of an order approving this Agreement by the Bankruptcy Court each of Lessor's and Lessee's chapter 11 case;

**NOW, THEREFORE,** for and in consideration of the premises and the mutual promises, undertakings and covenants set forth herein, the receipt, adequacy and sufficiency whereof are hereby acknowledged, the parties hereto, intending to be and being legally bound hereby, agree as follows:

1.      That upon the Lease Termination Agreement becoming effective, the Agreement shall be terminated and the parties hereto shall have no further rights or obligations under the Agreement.

1

2.      This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of Georgia.

3.      Wherever possible, each provision of this Agreement shall be interpreted to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, said provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

4.      This Agreement may be executed in multiple counterparts and shall be effective between the parties hereto in accordance with the provisions hereof when the counterparts taken together bear the signatures of the party or parties to be bound.

5.      The undersigned hereby acknowledge and represent that each has been fully advised by its legal counsel of its respective rights and responsibilities under this Agreement, that their respective duly-appointed representatives have read and understand completely the contents hereof, and that they have voluntarily executed this Agreement on their own accord. Further, the undersigned hereby acknowledge and represent that each party has cooperated in the drafting and preparation of this Agreement. Accordingly, the undersigned hereby acknowledge and agree that any construction or interpretation of this Agreement shall not be made in favor of or against either party, but rather shall be fair and reasonable based on the plain language of this Agreement and the intent of the parties expressed herein.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered in their names and on their behalf, and their seals to be affixed, all as of the day and year first written above.

HIDDEN LAKE ACADEMY, INC.


By: _____

        Leonard Buccellato, President

2

HLA, Inc.

By: _____
        Kenneth Spooner, President

## <u>TERMINATION AGREEMENT</u>

This **Termination Agreement** (this "<u>Agreement</u>") is made and entered into as of this _____ day of January, 2010, by and between HIDDEN LAKE ACADEMY, INC., a Georgia corporation ("<u>Lessor</u>") and HLA, Inc., a Georgia non-profit corporation ("<u>Lessee</u>").

### <u>WITNESSETH:</u>

**WHEREAS,** Lessor and Lessee entered into that certain Lease Agreement  dated January 1, 1998, and extended by the certain Extension Of Commercial Lease agreement dated December 31, 2007 (the "<u>Lease</u>") which provided for the lease of the Premises (as defined in the Lease) by Lessee from Lessor;

**WHEREAS,** the Lease provides for a lease term through and including September 30, 2045, unless the Lease is otherwise terminated in accordance with the Lease;

**WHEREAS,** pursuant to the Lease Lessee owes Lessor no less than $2,621,928.00 in unpaid rent;

**WHEREAS,** the Lessee is unable to perform under the Lease and Lessor has the opportunity to relet the Premises;

**WHEREAS,** Lessor is willing to terminate the Lease effective on January 15, 2010;

**WHEREAS,** on May 14, 2009, both Lessor and Lessee filed voluntary petitions for relief under Title 11 chapter 11 in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), which remain pending under case numbers 09-22028 and 09-22026, respectively.

**WHEREAS,**  the parties hereto understand and acknowledge that this Agreement shall not be effective until the earlier to occur of (i) the dismissal of Lessee's chapter 11 case, or (ii) entry of an order approving this Agreement by the Bankruptcy Court each of Lessor's and Lessee's chapter 11 case;

**NOW, THEREFORE,** for and in consideration of the premises and the mutual promises, undertakings and covenants set forth herein, the receipt, adequacy and

1

sufficiency whereof are hereby acknowledged, the parties hereto, intending to be and being legally bound hereby, agree as follows:

1. Upon the earlier to occur of entry of an order of dismissal in Lessee's bankruptcy case or an order approving this Agreement in Lessor's bankruptcy case, the Lease shall be and is, from and after the date hereof, terminated.

2. Lessor and Lessee acknowledge and agree that pursuant to Paragraph 6 of the Lease, Tenant has constructed buildings on the Premises which have a useful life, as determined by applicable Internal Revenue Code and Regulations of 37 years.

3. Lessee shall remain liable for all unpaid rent owed to Lessor as of the date hereof.

4. Lessor hereby covenants and agrees that Lessee shall have no continuing rental obligations from the date hereof under the Lease.

5. This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of Georgia.

6. Wherever possible, each provision of this Agreement shall be interpreted to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, said provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

7. This Agreement may be executed in multiple counterparts and shall be effective between the parties hereto in accordance with the provisions hereof when the counterparts taken together bear the signatures of the party or parties to be bound.

8. The undersigned hereby acknowledge and represent that each has been fully advised by its legal counsel of its respective rights and responsibilities under this Agreement, that their respective duly-appointed representatives have read and understand completely the contents hereof, and that they have voluntarily executed this Agreement on their own

accord.  Further, the undersigned hereby acknowledge and represent that each party has cooperated in the drafting and preparation of this Agreement.  Accordingly, the undersigned hereby acknowledge and agree that any construction or interpretation of this Agreement shall not be made in favor of or against either party, but rather shall be fair and reasonable based on the plain language of this  Agreement and the intent of the parties expressed herein.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered in their names and on their behalf, and their seals to be affixed, all as of the day and year first written above.

LESSOR: HIDDEN LAKE ACADEMY, INC.

By: _____

 Leonard Buccellato, President

LESSEE: HLA, Inc.

By: _____

 Kenneth Spooner, President